IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>SOUTHERN DIVISION</u>

| | |
|---|---|
| JOHN FORREST PARKER, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 00-B-1846-S |
| | ) |
| MICHAEL HALEY, Commissioner, Alabama | ) |
| Department of Corrections, | ) |
| | ) |
| Defendant. | ) |

<u>MEMORANDUM OF OPINION</u>

John Forrest Parker, hereinafter referred to as petitioner, filed this petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Parker is represented by counsel.

<u>PROCEDURAL BACKGROUND</u>

On June 6, 1989,  Parker was convicted in the Circuit Court of Colbert County of capital

murder.  A sentencing hearing was held before the same jury the next day, and the jury recommended

a sentence of life imprisonment without parole by a vote of 10-2.  On June 21, 1989, the trial court

sentenced Parker to death by electrocution.  On September 20, 1991, the Alabama Court of Criminal

Appeals remanded the case to the trial court for an evidentiary hearing to be held on the *Batson* issue

and for the trial judge to make new written findings regarding the aggravating and mitigating

circumstances, weigh those circumstances, and enter a proper sentencing order.  *Parker v. State*, 587

So.2d 1072 (Ala. Crim. App. 1991).  On return to remand, petitioner's conviction was affirmed.

*Parker v. State*, 610 So.2d 1171 (Ala. Crim. App. 1992).  The Alabama Supreme Court affirmed the

judgment of the Alabama Court of Criminal Appeals. *Ex parte Parker,* 610 So.2d 1181.  The United

States Supreme Court denied Parker's petition for writ of certiorari to the Supreme Court of Alabama

on June 28, 1993. *Parker v. Alabama*, 509 U.S. 929 (1993).

On December 2, 1994, Parker filed a petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Colbert County.  Rule 32 evidentiary hearings were conducted August 1-3, 1996.  On November 7, 1996, Parker filed an amended Rule 32 petition.  Additional Rule 32 hearings were conducted on November 12, 1996.  On August 5, 1997, the Rule 32 petition was denied.  On April 30, 1999, the Alabama Court of Criminal Appeals affirmed the denial of the Rule 32 petition.  The Alabama Supreme Court denied Parker's petition for writ of certiorari to the Alabama Court of Criminal Appeals on December 17, 1999.  The federal petition for writ of habeas corpus before this court was filed on December 11, 2000.[1/]

FACTS OF THE CASE

On direct appeal, the Alabama Court of Criminal Appeals attached as an appendix to its opinion the amended sentencing order of the trial court prepared after remand and the appellate court specifically found that the amended order was supported by the record.  The amended sentencing order recited the facts of this case:

> The Court finds from the evidence introduced at trial that the defendant, John Forrest Parker, and his friend, Kenneth Eugene Smith, on the morning of March 18, 1988, went to the home of Elizabeth Dorlene Sennett in rural Colbert County, Alabama, with the intent to kill said Elizabeth Dorlene Sennett.  The Court further finds from said evidence that the day before, Billy Gray Williams had paid the defendant the sum of One Hundred and No/100 ($100.00) Dollars to use for purchasing a weapon to be used in said murder, but that the defendant used that money for drugs to "shoot up."  The Court further finds that the defendant was promised One Thousand and no/100 ($1,000.00) Dollars for the killing by Billy Gray Williams, and that

---

[1/]    This federal action was stayed from January 29, 2002 until August 12, 2002 and again from December 9, 2003 until August 10, 2004, at the request of both parties, awaiting decisions by the United States Supreme Court in *Ring v. Arizona*, 536 U.S. 584 (2002) and *Schriro v. Summerlin*, ____ U.S. ____, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

he would be paid the balance when the job was done.  The Court further finds that Kenneth Eugene Smith and the defendant, John Forrest Parker, drove to the residence of Elizabeth Dorlene Sennett in the defendant's vehicle.  The Court further finds that the defendant shot up 3 cc's of Talwin on the way to said residence.  The Court further finds that the defendant had been unsuccessful in securing a gun for "the job" and that he brought with him a survival knife.  The Court further finds that the defendant drove his vehicle to Elizabeth Sennett's home and that Kenneth Eugene Smith sharpened the defendant's knife all the way down there.  The Court further finds that they parked the defendant's car in the rear of the Sennett home.  The court further finds that the defendant and Mr. Smith asked Elizabeth Dorlene Sennett for permission to use the bathroom, which she gave them.  While in the bathroom, the defendant put cotton socks on his hands.  The Court further finds that when he came out of the bathroom, the defendant jumped Elizabeth Dorlene Sennett and started hitting her and together he and Kenneth Eugene Smith killed her by hitting her with a galvanized pipe, holding her down with a small blue chair and stabbing her while she was asking them not to hurt her.  The Court further finds that the defendant and Kenneth Eugene Smith took a VCR and a stereo to make it look like a burglary, which was in accordance with their plan, and that they also broke the glass in the medicine cabinet to further this plan.  The Court further finds from the evidence that the defendant and Kenneth Eugene Smith threw away the survival knife they had used for the killing, and that the defendant threw the stereo off a bridge and burned his clothes after the killing.  The Court further finds that the defendant was paid the additional Nine Hundred and no/100 ($900.00) Dollars after the killing.

610 So.2d 1178-79.

<u>THE § 2254 CLAIMS</u> [2/]

A.    Exclusion of jurors on the basis of race and gender

B.    Improper closing arguments by the prosecutor

C.    Erroneous jury instruction on reasonable doubt

---

[2/]    As a matter of internal organization each claim is addressed below with the corresponding state proceeding in which the claim was made, if in fact is was identified.

3

D.      Prosecution's failure to disclose *Brady* information

E.      Ineffective assistance of counsel

F.      Medicating of petitioner prior to and at trial without informing counsel and the court

G.      Trial court's failure to strike venirepersons who could not be impartial

H.      Trial court's override of jury's recommendation of life imprisonment without parole

I.      Admission of statement and other evidence resulting from illegal arrest

J.      Trial court's denial of request for change of venue

K.      Trial court's refusal of motion for recusal

L.      Petitioner's statement extracted in violation of *Miranda*

M.      Trial court's failure to instruct on lesser included offenses

N.      Challenge to Rule 32 process whereby judge reviews his/her own errors

O.      On remand for resentencing petitioner was not provided opportunity to present evidence on aggravating and mitigating circumstances

P.      Illegal arrest based on lack of jurisdiction of the Colbert County police officers

Q.      Statements were the result of illegal and unconstitutional duress

R.      Grand jury which indicted petitioner was selected in discriminatory and unconstitutional manner

## APPLICABLE LAW: WHERE CLAIM WAS ADJUDICATED ON THE MERITS IN STATE COURT

Because Parker's federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies to his case. *Williams v. Taylor*, 529 U.S. 420, 429 (2000); *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997)

Title 28 U.S.C. § 2254(d) provides:

4

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Title 28 U.S.C. § 2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed the "contrary to" and "unreasonable application" phrases of § 2254(d).

A state-court decision will ... be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. ... A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

....

A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case ... would qualify as a decision "involv[ing] an unreasonable application of ... clearly established Federal law."

....

5

> [A] federal habeas court making the "unreasonable application"
> inquiry should ask whether the state court's application of clearly
> established federal law was objectively unreasonable.
>
> ....
>
> [U]nder § 2254(d)(1)'s "unreasonable application" clause, then a
> federal habeas court may not issue the writ simply because that court
> concludes in its independent judgment that the relevant state-court
> decision applied clearly established federal law erroneously or
> incorrectly.  Rather, that application must also be unreasonable.
>
> ....
>
> [The phrase "clearly established Federal law"] refers to the holdings,
> as opposed to the dicta, of this Court's decisions as of the time of the
> relevant state-court decision.

529 U.S. at 405-12.

It is Parker's burden, as petitioner, to show that the state court applied a Supreme Court case to the

facts of his case in an objectively unreasonable manner.  *Price v. Vincent*, 538 U.S. 634, 641 (2003);

*Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002).

> [Section] 2254(d) dictates a "'highly deferential standard for
> evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333
> n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), which demands that
> state-court decisions be given the benefit of the doubt." *Woodford v.
> Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)
> (per curiam).

*Bell v. Cone*, _____ U.S. _____, 125 S.Ct. 847, 853, _____ L.Ed.2d _____ (2005).

"[W]hether a state court's decision was unreasonable must be assessed in light of the record the court

had before it." *Holland v. Jackson*, _____ U.S. _____, 124 S.Ct. 2736, 159 L.Ed.2d 683 (2004).

In this case, numerous hearings were conducted, including hearings on the Rule 32 petition.

The record before the state courts is also before this court.  There has been no challenge to the

sufficiency of the evidence adduced in the state court hearings; therefore, this court need not conduct

6

an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2) and (f).  This court has familiarized itself with the entire record in this case including pretrial, trial and post-trial hearings in addition to the thorough findings of fact and decisions entered by the trial court based upon the evidence adduced during the hearings.  Moreover, the appellate courts' opinions on direct appeal were comprehensive.  Although the appellate court opinion on appeal from the denial of the Rule 32 petition was not as comprehensive as the opinion on direct appeal, the appellate court reviewed an extremely detailed and comprehensive order from the trial court denying the Rule 32 petition.  This court's review under 28 U.S.C. § 2254(d) is simplified by the solid evidentiary and legal foundation laid by the state trial and appellate courts.  When reviewing the state court decisions this court has continued to heed the admonishment of the Supreme Court related to state court findings.[3]

A.      Whether Jurors were Excluded on the Basis of Race and Gender

        1. *Batson* discussion

Petitioner raised a *Batson* claim on direct appeal.  The Alabama Court of Criminal Appeals remanded the case for an evidentiary hearing  with directions that "the prosecution shall be required to give racially neutral reasons for the use of peremptory challenges against black venire members."  587 So.2d at 1077.  After remand, the Alabama Court of Criminal Appeals held:

> After conducting an evidentiary hearing on the matter,
> with commendable thoroughness and a conscientiousness warranted
> by the sentence imposed in this case, entered a written order in which

---

[3]     As recently as March 22, 2005, the United States Supreme Court reiterated that federal habeas relief is not due to be granted unless the conditions set forth in § 2254(d)(1) are met.  *Brown v. Payton*, ____ U.S. ____ , ____ S.Ct. ____ , ____ L.Ed.2d ____, 2005 WL 645182 (2005).  The Court emphasized that a state court decision involves an unreasonable application of clearly established Supreme Court precedent only if it applies the Court's precedents to the facts in "an objectively unreasonable manner."  *Id.* The Court criticized the Ninth Circuit Court of Appeals for second-guessing the state court's application of *Boyde v. California*, 494 U.S. 370 (1990) to similar but not identical facts, stating [e]ven on the assumption that [the California Supreme Court's] conclusion was incorrect, it was not unreasonable, and it is therefore just the type of decision that AEDPA shields on habeas review."

she made specific findings of fact and concluded that the principles of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), were not violated by the prosecution's use of its peremptory strikes to remove eight black venire members. That order is attached to this opinion as Appendix I.

The findings and conclusions contained in that order are fully supported by our own independent review of the record and are approved by this Court. We find that no violation of the principles of *Batson v. Kentucky, supra,* or *Ex parte Branch*, 526 So.2d 609 (Ala. 1987), occurred in this case. See *Ex parte Bird and Warner*, 594 So.2d 676 (Ala. 1991).

610 So.2d at 1172.

The trial court's order, Appendix I to the decision of the Alabama Court of Criminal Appeals

stated in pertinent part:

The Court having proceeded to consider the testimony given by the District Attorney, Gary Alverson, on behalf of the State, as well as having considered all of the testimony and evidence presented on behalf of the defendant, and the court noting for the record that 59 jurors from the original jury venire were present, having responded to subpoenas issued by the defendant, and the Court further having considered the original jury venire list which was stipulated to by the parties and which is already a part of the record on appeal, beginning with No. 3, S.A. and ending with No. 129, M.W., which list also reflects the strikes made by the State and the strikes made by the defendant, and the Court having considered all of the testimony and evidence presented in open Court, and based upon said evidence and testimony, the Court does find that the venire consisted of 79 prospective jurors, 10 of which were excused, leaving the number at 69. There were 9 black jurors on said venire, and 60 white jurors. The 9 black venire members comprised 13% of the venire. The blacks comprised 8% of the trial jury.

The Court further finds that the State presented evidence which indicated that venire member No. 3, a black female named S.A., was stricken by the State because she was the daughter of E.A., who was being prosecuted by the District Attorney at that time for the offense of Theft of Property in the First Degree.

8

The Court further finds that venire member No. 21, a black female, was stricken by the State because she knew the victim's husband's girlfriend, D.T. The victim's husband had procured this defendant and his co-defendants to kill his wife, and D.T. was a prospective witness for the defendant at the time of selection of the jury. The District Attorney also testified that she was stricken because she was related to one R.C. who had been prosecuted for violation of the Alabama Uniform Controlled Substance Act and because of her statement that she was generally opposed to the death penalty. The State further presented evidence that B.R., white veniremember No. 92, was struck for the same general reasons by the State. The State further presented evidence that said veniremember T.C. indicated during voir dire that she had some knowledge and training in psychology. The District Attorney testified that he struck all veniremembers who had training in the field of psychology because they might place undue emphasis on defense witness Dr. Crowder's testimony. The District Attorney testified that white veniremember No. 129, M.W., white veniremember No. 92, B.R., white veniremember No. 63, R.L., white veniremember No. 58, S.L., white veniremember No. 9, R.B., and white veniremember No. 82, M.N., were all stricken for that same reason, inasmuch as they responded during voir dire that they had some knowledge and training in the field of psychology.

With respect to veniremember No. 25, a black male by the name of J.D., the State indicated that the reason they struck said veniremember was because he indicated during voir dire that he had has [sic] difficulty staying overnight, and white veniremember 53, J.J., and white veniremember No. 40, P.H., were stricken for the same reason by the State. The State further presented evidence that J.D. had stated during voir dire: "I really don't want to be here" and that that was an additional reason the State struck veniremember No. 25, J.D.

The State presented evidence that they had stricken veniremember No. 67, a black female by the name of W.M., because she indicated during voir dire that she has worked with members of the family of Billy Gray Williams, the black co-defendant to the defendant in this case, whose case had been tried at the time; that she had heard discussions regarding this case, and white veniremember No. 68, B.M., was stricken for the same reason inasmuch as she stated during voir dire that she knew the family of the defendant, John Forrest Parker, in this case, the co-defendant of Billy Gray Williams.

9

With respect to veniremember No. 77, black female C.M., the State presented evidence that they had stricken her because the District Attorney had information that she was a cousin to R.M. and J.M., who had been prosecuted by the District Attorney on drug charges and further on the ground that drug use and violations were factually related to this case. The State further offered as an excuse for striking veniremember C.M. she had a child born out of wedlock and that the defendant in this case likewise had a child born out of wedlock, and the State indicated that they felt like veniremember C.M. would be sympathetic toward the defendant and his case for this reason.

With respect to veniremember No. 83, a black female, A.O., the State presented evidence that they struck veniremember A.O. because she was married to T.O., who is the brother of W.E.O., who at the time of the trial of this cause had a pending criminal case against him for sale of cocaine. Further, this veniremember's husband, T.O., was a defendant in a civil forfeiture case arising out of the same sale of cocaine case against W.E.O., at the time this case was tried, and, further, veniremember A.O. stated during voir dire that she knew the attorney for the defendant, Gene Hamby, through her work with the City of Sheffield.

With respect to veniremember No. 20, black male, E.L.W. the State offered as evidence of the reason for their striking veniremember E.L.W. that he had a series of traffic offenses in recent years, indicating a disregard for the law, and the State offered testimony that they also struck veniremember No. 129, M.W. with a similar type record for the same reason.

With respect to veniremember No. 121, black female by the name of M.A.W., the State indicated that they struck veniremember M.A.W. because she had indicated during voir dire that she had training in the area of psychology. The State struck white veniremember No. 129, M.W., white veniremember No. 92, B.R., white veniremember No. 63, R.L., white veniremember No. 58, S.L., white veniremember No. 9, R.B., and white veniremember No. 82, M.N. for the same reason, in addition to black veniremember No. 21, T.C., who was struck for this reason, among others, by the State.

Black veniremember No. 113, C.T., served on the trial jury in this case.

On cross-examination the District Attorney, Gary Alverson, testified that his information regarding traffic tickets was obtained from the

local police department and the Colbert County Circuit Clerk's records; that the State was particularly concerned about jurors with more than one traffic ticket. The District Attorney testified that information on veniremembers' relatives regarding felony cases, pending or disposed of, was obtained from the circuit court files in the Circuit Clerk's office in Colbert County.

No evidence was presented during the hearing which contradicted the State's evidence that veniremember T.C. was related to R.C., who had been prosecuted by the District Attorney on a drug case; that veniremember C.M. was related to R.M. and J.M., who were prosecuted by the District Attorney on drug charges; that veniremember A.O. was related to T.O., who was a defendant in a forfeiture case where the State was the plaintiff at the time of the trial, and that she was related to W.E.O., who was a defendant in a sale of cocaine case brought by the State at the time of this trial. Further, the State's testimony with respect to pending charges and convictions of relatives of these veniremembers was uncontradicted.

The District Attorney testified that he did not ask members of the jury venire whether or not anyone had children born out of wedlock because he felt it would embarrass the veniremembers to whom they would apply. The District Attorney obtained this information through other sources, namely through local law enforcement officers and his investigator's efforts in Colbert County, Alabama.

The Court further finds that Juror No. 88, M.Q., testified that he had a first cousin who had been convicted of a felony (breaking into some houses) but that he thought it was in Franklin County. Said juror also testified that he did not have more than one regular traffic ticket but had traffic tickets when he was part of the railroad crew which was discharged for violating the speeding regulations for trains.

Veniremember No. 46, L.H., testified that she had a family member, namely an uncle by marriage, who had been convicted of a felony in Colbert County.

Juror No. 8, J.R.A., testified that he had a relative who had been convicted of a felony, namely, making whiskey, fifteen years ago.

Juror No. 78, N.G.M., testified that he had a brother who had been convicted of a felony twenty years ago in Lawrence County, Alabama (as an accessory to a robbery).

11

Juror No. 85, W.G.P., testified that he had had more than one traffic conviction; however, only one was in Colbert County, and it was seven to eight years ago.

Juror No. 11, J.S., testified that she had more than one traffic ticket, namely, two old ones, one from Florence, Lauderdale County, Alabama, and one from Muscle Shoals, Colbert County, Alabama, another one in 1987 in Lauderdale County, and one in Sheffield, Alabama, in 1988.

Juror No. 64, L.L., testified that she had a relative in Florida, an uncle on her mother's side, who was convicted of a felony 12-15 years ago; said juror thought it was a manslaughter case, and the conviction was in the State of Florida.

Juror No. 41, G.H., foreman of the trial jury, testified that he had a first cousin who had been convicted of what he thought was a felony in Madison County, Alabama. Said juror further testified that during the past ten years he has had two speeding tickets, one in Colbert County and one in Lauderdale County.

Juror No. 66, T.R.M., testified that he had had a couple of traffic tickets, one in Leighton, Colbert County, Alabama, and one in Lauderdale County, from Rogersville in 1982.

Based on the testimony presented by the District Attorney, the Court finds that it was the practice of the District Attorney to check municipal police departments, the district court and the circuit court in Colbert County, Alabama, for traffic violations and further finds that the practice of the District Attorney's office was to strike jurors who had a series of traffic violations within the recent past, and further finds that said practice was not rebutted by the testimony of the jurors called on behalf of the defendant, the Court finding that none of those jurors had more than one traffic ticket from Colbert County, either municipal, district or circuit court, in the recent past, and although some had more than one traffic ticket, said convictions were in other circuits. The information concerning out-of-Circuit or out-of-State convictions was not shown to be known to the District Attorney at the time of striking of the jury. The Court further finds that of the jurors who testified on behalf of the defendant one would have been stricken by the State pursuant to the State's practice, namely veniremember No. 46, L.H., and the District Attorney agreed that he overlooked her relationship by marriage to a person who had been convicted of a felony in Colbert County, Alabama. The Court

further finds from the evidence that if the State had sought additional verification of its traffic information on veniremembers through the computer record from the State Department of Public Safety, the State would only have been able to get jurors' traffic records for the last five years. The District Attorney further testified that with respect to his practice that he intended to strike all jurors who had training in the field of psychology, that he overlooked the information obtained during the lengthy voir dire with respect to juror No. 11, J.S. The District Attorney testified that that was his mistake. The Court does not find that there was a significant disparate treatment of members of the jury venire with the same characteristics, or who answered a question in the same manner.

The Court finds that there was no proof that there was a pattern of strikes against black jurors on this particular venire. The State had 28 strikes available and struck 8 black veniremembers and 20 white veniremembers, thus using 29% of its strikes to strike black veniremembers.

The Court does not find that there was any specific evidence of any past conduct of the State's attorney in using peremptory challenges to strike all blacks from the jury venire. Although the defendant asked the Court to take judicial notice of the jury lists in several cases, the majority of which were not tried before the undersigned judge, the undersigned judge has no knowledge from the evidence presented at this hearing why the particular jurors were chosen in these other cases, and does not find that mere juror lists is proof of intentional past discriminatory practice on the part of the District Attorney. In two of the cases submitted by defendant, the State struck fewer black veniremembers than the defense, (CC-87-137 and -138).

The Court further finds that the State's attorney's questions and statements during voir dire were very detailed, and much more than a desultory voir dire.

The Court does not find from the evidence that the State's questions directed to the challenged veniremembers, both in the sense of the questions that were asked, and in the sense of the questions that were not asked were calculated to enable the State to strike the black veniremembers.

The Court does not find that there was a significant disparate treatment of members of the jury venire with the same characteristics, or who answered a question in the same or similar manner.

13

The Court does not find that the voir dire examination of members of the venire on behalf of the State was designed to provoke certain responses which were likely to disqualify black veniremembers but not white veniremembers.  The Court does not find that there was any circumstantial evidence of intent on the part of the District Attorney to strike the jurors for other reasons than race-neutral reasons.

Although the State did strike all but one black veniremember on the venire, the court finds from the evidence that the percentage of black jurors on the venire was 13% and the percentage of black jurors on the trial jury was 8%.

With respect to the testimony of David Thompson, former investigator for the District Attorney, this Court finds that said David Thompson was not the investigator for the District Attorney at the time of the jury selection in this case.  To the contrary, he had been gone from his employment with the District Attorney's office for nearly two years (from August 1987 until May 1989).  This Court further finds that said investigator did little, if any, jury investigation for the District Attorney's office.  Based on the testimony of Assistant District Attorney Ronald Hudson, this Court simply finds that said witness' testimony was not believable.  This Court further finds that the District Attorney's office had in fact explained the *Batson decision* to said David Thompson while he was one of the investigators for the District Attorney's office.  This Court further finds that this District Attorney's office was the first in the State to apply *Batson* to the defense at the trial level.

Based on all of the evidence presented in open Court, this court finds that the prosecution's strikes were race-neutral, this court specifically finding no pattern of strikes against black jurors on this particular venire, no proof of any intentional past conduct of the State's attorney in using peremptory challenges to strike all blacks from the jury venire, no proof that the voir dire was a desultory voir dire; and no disparate treatments of members of the venire who gave similar answers or with respect to whom the State had similar information.

This Court finds that the defendant in this case had a public trial by an impartial jury as guaranteed by *Amendment VI* of the Constitution of the United States of America.

See also, *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.[2d] 69 (1986); *Powers v. Ohio* [499 U.S. 400], 111 S.Ct. 1364 [113 L.Ed.2d 411] (1990); *Ex parte Branch*, 526 So.2d 609 (Ala.

> 1987); *Harrell v. State*, 555 So.2d 263, 268 (Ala. 1989); *Stephens v.
> State*, 580 So.2d 11 (Ala. Civ. App. 1990), affirmed, 580 So.2d 26
> (Ala.), *cert. denied,* 502 U.S. 859, 112 S.Ct. 176 [116 L.Ed.2d 138]
> (1991); *Bryant v. State*, 516 So.2d 938 (Ala. Cr. App. 1987); *Ex parte
> Bird and Warner*, 594 So.2d 676 (1991); and *Jackson v. State* [594
> So.2d 1289] (Ala. Cr. App. 1991).

610 So.2d at 1173-77.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held that the

Equal Protection Clause of the Fourteenth Amendment prohibits peremptory strikes based solely on

race, and established a three step process for evaluating those claims.  In *Miller-El v. Cockrell*, 537

U.S. 322 (2003) the United States Supreme Court reviewed the three step *Batson* process:

> First, a defendant must make a prima facie showing that a peremptory
> challenge has been exercised on the basis of race.  Second, if that
> showing has been made, the prosecution must offer a race-neutral
> basis for striking the juror in question.  Third, in light of the parties'
> submissions, the trial court must determine whether the defendant has
> shown purposeful discrimination.

537 U.S. at 328 (citations omitted).

In *Batson*, the Court said that the defendant could establish a *prima facie* showing in the

following manner:

> [T]he defendant first must show that  he is a member of a cognizable
> racial group [citation omitted] and that the prosecutor has exercised
> peremptory challenges to remove from the venire members of the
> defendant's race.  Second, the defendant is entitled to rely on the fact,
> as to which there can be no dispute, that peremptory challenges
> constitute a jury selection practice that permits "those to discriminate
> who are of a mind to discriminate."  [Citation omitted.]  Finally, the
> defendant must show that these facts and any other relevant
> circumstances raise an inference that the prosecutor used that practice
> to exclude the veniremen from the petit jury on account of their race.
> ....
>
> In deciding whether the defendant has made the requisite showing,
> the trial court should consider all relevant circumstances.  For

example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.  We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

476 U.S. at 96-97.

The *Batson* Court continued:

Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. ... The trial court then will have the duty to determine if the defendant has established purposeful discrimination.

476 U.S. at  98.

In footnote 21, the Court wrote:

In a recent Title VII sex discrimination case, we stated that "a finding of intentional discrimination is a finding of fact" entitled to appropriate deference by a reviewing court.  *Anderson v. Bessemer City*, 470 U.S. 564, 573 ... (1985).  Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.  *Id.* at 575-576....

In *Powers v. Ohio*, 499 U.S. 400 (1991), the Court held that in a trial of a white criminal defendant,[4/] a prosecutor is prohibited from excluding black jurors on the basis of race.  Obviously, when this case was tried in 1989, *Powers* had not been decided; however, by the time it was remanded on direct appeal for an evidentiary hearing, *Powers* had been decided.

In the *Batson* hearing, petitioner demonstrated that with its first twelve strikes, the prosecution struck eight of the nine black jurors,  members of a cognizable racial group.  (E.H.,

_____

[4/]      Petitioner is white.

16

pp.28-30).  He was entitled to rely on the fact that the practice of peremptory challenges permits "those to discriminate who are of a mind to discriminate."  *Batson, supra*.  While this "pattern" of strikes against black jurors  might give rise to an inference of discriminatory purpose, petitioner has identified no other relevant circumstances that would be relevant to whether the petitioner established a *prima facie* case of discrimination against black jurors.  Petitioner's assertion that the prosecutor's  proffered reasons for the strikes were shams and pretexts for racial discrimination is not relevant to the first *Batson* step but rather would go to the third *Batson* step.

The *Miller-El* Court explained that at the third step,

> [T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

537 U.S. at 339.

The state court's finding on the issue of discriminatory intent is accorded significant deference as the trial court is in a superior position to make credibility determinations.  537 U.S. at 339.  On federal habeas review, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." 537 U.S. at 340.

At the evidentiary hearing, the prosecutor testified concerning his reasons for the strikes and the petitioner then submitted testimony of white jurors who were not stricken by the prosecutor.  The testimony by petitioner's witnesses went not to petitioner's *prima facie* case but, rather, to whether

the  reasons given by the prosecutor for striking black jurors were not credible because he did not apply the same standards to white jurors.  Contrary to petitioner's assertion, the trial court did not impermissibly  shift the evidentiary burden to petitioner.  Rather, she looked to the petitioner for testimony that would tend to show that the prosecutor's race neutral reasons for the strikes were not credible.

At the evidentiary hearing, the prosecutor explained his reasons for striking eight of the nine black jurors, and the trial court's order accurately reflects the explanations given and that white jurors were also stricken for many of the same reasons.  (EH, pp. 17-26).  Petitioner presented testimony of white jurors who were not stricken for reasons that the prosecutor used for striking black jurors; however,  the trial judge in effect found that with only two exceptions, the white jurors identified by petitioner were not similarly situated to the black jurors who were stricken.  With respect to the two jurors who should have been stricken, the trial court found that the prosecutor's failure to do so was based on his mistake.  The white juror (L.H.), whose uncle had been charged with or convicted of a felony in Colbert County, had a different last name than her uncle and there was no testimony about whether the uncle's prosecution occurred within the five year period that was the scope of the prosecutor's research.  (EH, p. 64)[5]  Even though J.S., a white juror, was not stricken despite having taken psychology classes, six other white jurors, in addition to the black jurors T.C. and M.W., were stricken – thus lending credence to the prosecutor's statement that it was an error on his part that she was not stricken as he had intended to strike everyone who had training or courses in psychology.  (EH, p. 18-21, 25-26, 32).

---

[5]      Interestingly, L.H. was in fact stricken from the venire by petitioner with his fourteenth strike; therefore, unlike the other white jurors identified by petitioner, L.H. did not actually sit on petitioner's jury.  (Supplemental transcript, p. 136)

Based on a review of the *Batson* evidentiary hearing, the voir dire proceedings, and the trial court's order following the *Batson* evidentiary hearing, the Court concludes that the state court's decision was not contrary to nor did it involve an unreasonable application of *Batson* and its progeny. Further, the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

2.   *J.E.B.* discussion

In the amended petition, petitioner argued that "[t]he practice of the prosecutor in this case in striking female jurors deprived Mr. Parker of due process and equal protection of the law in violation of the Fourteenth Amendment to the United States." (Amended petition, p. 15).

On direct appeal the Alabama Court of Criminal Appeals did not remand for an evidentiary hearing on the issue of whether the prosecution used peremptory strikes to remove women from the venire.  The court stated:

> There was no objection made in the circuit court at any time to the alleged gender bias of the prosecution.  While I adhere to my position that gender discrimination is prohibited under state law, that argument has been explicitly rejected by the other members of this Court, see *Daniels v. State*, 581 So.2d 536, 539 (Ala. Cr. App. 1990), *cert. denied,* 581 So.2d 541, (Ala. 1991), and *Dysart v. State*, 581 So.2d 541, 542-43 (Ala. Cr. App. 1990), *cert. denied,* 581 So.2d 545 (Ala. 1991), and apparently by a majority of the members of the Alabama Supreme Court, see *Ex parte Dysart*, 581 So.2d 545 (Ala. 1991).

587 So.2d at 1077-78.

In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits discrimination in jury selection on the basis of gender.  Until *J.E.B.*, there was no prohibition against striking jurors on the basis of sex.  In *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), the Supreme Court held that "A new

rule for the conduct of criminal prosecutions [such as *Batson*] is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."  In *Allen v. Hardy*, 478 U.S. 255 (1986), the United States Supreme Court held that *Batson* should not be applied retroactively on collateral review of convictions that became final before *Batson* was announced.  Similarly, *J.E.B.* should not be applied retroactively on collateral review of convictions that became final before *J.E.B.* was announced.  Petitioner's conviction became final on June 28, 1993, when the United States Supreme Court denied certiorari.  *J.E.B.* was not decided until April 19, 1994; therefore, *J.E.B.* should not be applied retroactively in this case.

Because there was no clearly established United States Supreme Court precedent on this issue at the time of the state appellate court's decision, the decision was not contrary to nor did it involve an unreasonable application of clearly established federal law.

B.     Whether the Allegedly Improper Closing Arguments of the Prosecutor
       Denied Petitioner Due Process, a Fair Trial and a Reliable Sentencing
       Proceeding in Violation of the Sixth, Eighth and Fourteenth Amendments

On direct appeal, the Alabama Court of Criminal Appeals considered petitioner's claims of improper closing arguments and stated:

> The appellant argues that the prosecutors' improper closing arguments deprived him of a fair trial and a reliable sentencing proceeding.  There was no objection to any argument of the prosecutors either at the guilt or the sentence phase of the trial.
>
> Because there was no objection at trial and because this is a death case, we must consider whether the prosecutors' remarks constitute plain error.  "Plain error exists when the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings...; in other words, 'plain error' exists when a substantial right of the defendant has or probably has been adversely affected."  *Ex parte Smith*, 581 So.2d 531, 532 (Ala. 1991).  Accord,

20

*Kuenzel v. State*, 577 So.2d at 481-82.  "'Error' is 'plain error' only
when it 'has or probably has adversely affected the substantial rights
of the [defendant],' Rule 39(k), A.R.App.P., and plain error is to be
acted upon 'in the same manner as if the defendant's counsel had
preserved and raised [the] error for appellate review.'  *Johnson v.
State*, 507 So.2d 1351, 1356 (Ala. 1986)." *Ex parte White*, 587 So.2d
1236 (Ala. 1991).

## A.  GUILT PHASE ARGUMENT

Early in his closing argument at the guilt phase of the trial, the
assistant district attorney stated:

> "What do we have that would go toward tying John Parker to
> this crime.  Of course, the most obvious things we've got is
> his statement.  We got a confession from him.  And I know
> good and well that you don't think that that statement came
> any other way but than the way Mr. May said it did.  I've
> known Ronnie May for a long time and worked with him for
> a long time and, of course, when we put a witness on the
> witness stand we vouch for their credibility just as the defense
> does when they call a witness.  But I can assure you right now
> that what Ronnie May testified to you about–about anything,
> but particularly about the statement that I'm talking about
> right now that was given to him on March the 31st by Mr.
> Parker.  I can assure you he told you the truth, what was told
> him by Mr. Parker.  And I don't for any one minute think that
> any of y'all think he would get up and make it up or fabricate
> it or anything like that.  But I can assure you, ladies and
> gentlemen, what he told you is the truth with regard to that
> statement."

R. 1575.  That same assistant district attorney also stated:

> "We've got other testimony [in addition to the statement].
> We've got the testimony of Donald Buckman.  Mr. Buckman
> came in here and testified before you and I can assure you he
> didn't have anything against John Parker.

R. 1576.

> "Is that person [the forensic pathologist] best qualified to tell
> you about it, about the possible murder weapon or is it the
> doctor that worked on the person in the emergency room and

was primarily trying to save her life.  Again, I'm not try[ing] to in any way run down Dr. McKinley.  I know Dr. McKinley.  He's a personal acquaintance of mine and I can assure he's – when he came in here and said what he did the other day he was giving you his opinion, his best opinion, but again I say to you; who is best qualified to give that opinion?"

R. 1581-82.

In the State's final closing argument, the district attorney stated:

"There is no such thing as a case that you couldn't look at long enough and hard enough and find some kind of little inconsistency in the testimony and the reason for that is, I submit to you at least from the State's witnesses they were trying very hard to tell you the truth and the truth as they saw it.  Like Mr. Hudson said, we vouch for the credibility of those witnesses by putting them on the stand and I submit to you that they've told the truth, ..."

R. 1611.

Obviously, the above-quoted comments of the prosecutors were improper attempts to bolster witnesses by vouching for their credibility.

"'Attempts to bolster a witness by vouching for his credibility are normally improper and error.'  *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977).  The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.  *United States v. Roberts*, 618 F.2d 530, 537 (9th Cir. 1980) (citing *Ellis*, *supra*).  This test may be satisfied in two ways.  First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity.  *See United States v. Lamerson*, 457 F.2d 371, 372 (5th Cir. 1972); *Gradsky v. United States*, 373 F.2d 706, 709-10 (5th Cir. 1967).  Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.  *See United States v. Brooklier*, 685 F.2d 1208, 1218 (9th Cir. 1982) (explaining *United States v. Roberts*, 618 F.2d 530 (9th Cir. 1980))."

22

*United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1308, 79 L.Ed.2d 703 (1984). The question in this case is whether those comments constitute "plain error."

In *Murry v. State*, 562 So.2d 1348, 1353-56 (Ala. Cr. App. 1988), this Court thoroughly considered a similar issue. Applying the principles there set out, we conclude that the prosecutors' arguments in this case do not constitute plain error. The remarks, although clearly erroneous, do not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Murry*, 562 So.2d at 1354. Those remarks must be viewed in the context of the prosecutors' entire argument and in the course of the entire trial.

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Murry*, 562 So.2d at 1354 (quoting *United States v. Swafford*, 766 F.2d 426, 428 (10th Cir. 1985)). In his closing argument, defense counsel did not contend that the appellant's confession was false. Indeed, he argued that the appellant is "not denying that he was out there the 18th. His statement says he was." R. 1591. He also argued: "As I said, there's no question, John Parker and Kenny Smith were there and what did he tell Ronnie May. 'We were going out there to commit a burglary.'" R. 1596.

Furthermore, as this Court stated in *Murry*, "we are confident that the remark[s] did not undermine the fairness of the trial, because any prejudice which might have resulted from the comment[s] was cured by the court's extensive cautionary instructions in its oral charge to the jury." 562 So.2d at 1355. In her instructions to the jury, the trial judge charged:

> "In determining what the true facts are in the case, you are limited to the evidence that has been presented from the witness stand as opposed to matters that have been stated by the attorneys in the course of the trial. What the attorneys have said both for the State and for the Defendant is not evidence in the case. What they have argued to you at various points in the trial is not evidence. They have a right and they have a duty at the appropriate time in the trial to comment on the evidence and draw reasonable inferences from the evidence as they argue their respect[ive] positions to you.

> What they say is not evidence and you should put what they say in a proper category in your thinking and it should not be in the evidence category, just as the indictment in the case should not be in the evidence category."

R. 1641-42.

In addition, we find in this case, as we did in *Murry*, that:

> "when the remark is considered in the context of defense counsel's arguments and subsequent instructions by the court, it did not 'induce the jury to trust the Government's judgment rather than its own view of the evidence.' [ *United States v. Young*, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985)].  Finally, while the failure to object certainly does not preclude review in a capital case, it does weigh against any claim of prejudice.  *See, e.g., Ex parte Bush*, 431 So.2d 563 (Ala.), *cert. denied,* 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983)."

562 So.2d at 1355-56.

We find that other remarks of the prosecutors which are objected to on appeal for the first time were within the range of legitimate argument and do not constitute improper comment.

## B.  SENTENCE PHASE

The appellant complains that during the prosecutor's argument during the sentence phase of the trial, the prosecutor improperly 1) urged the jury to recommend death based upon unsubstantiated allegations of criminal behavior that had never been charged nor proven, 2) exhorted the jury to "do the right thing" and to sentence the appellant to death, and 3) argued that the appellant would kill again.

Even accepting the appellant's contention that these comments constituted error, which we do not, any error would be harmless because the jury, by a vote ten to two, recommended life without parole.  The present situation is analogous to that in *Leverett v. State*, 462 So.2d 972, 977 (Ala. Cr. App. 1984), where the Court stated:

> "[T]he verdict clearly indicates that the jury was not in any manner inflamed or influenced by these bits of evidence.  *See Morgan v. State*, 35 Ala. App. 269, 45 So.2d 802 (1950).

24

> Error in the admission of evidence which is shown by the verdict to have had no effect on it or to have caused the defendant no prejudice is not reversible. 24B C.J.S. *Criminal Law* § 1915(13) (1962).  Thus, there is no reversible error where the defendant was acquitted of the offense with respect to which the improper evidence was admitted, although he was convicted of another offense.  *Id*.  *See also Middleton v. State*, 27 Ala. App. 564, 176 So. 613, 614 (1937); *Hanson v. State*, 27 Ala. App. 147, 168 So. 698, 700 *cert. denied,* 232 Ala. 585, 168 So. 700 (1936); *Lee v. State*, 16 Ala. App. 53, 75 So. 282, 283 (1917)."

> See also *Johnson v. Dugger*, 911 F.2d 440, 448, n.13 (11th Cir. 1990) ... ("Here, however, the sentencing jury returned an advisory sentence of life imprisonment.  Hence, any errors in the advisory jury's perception of what constituted mitigating factors would be harmless.").

587 So.2d at 1093-96. [footnote omitted]

On certiorari review, the Alabama Supreme Court affirmed but expounded on the context of the remarks:

> The Court of Criminal Appeals correctly resolved the numerous issues discussed in its opinion.  We find it necessary to discuss only one of those issues–whether it was plain error for the prosecutors to personally vouch for the credibility of two of the state's primary witnesses.

> Ronnie May, who was an investigator with the Colbert County Sheriff's Department and who had been the chief investigator in this case, sat with the prosecutors during the trial and helped them present the state's case.  May also served as a witness for the state; he testified that Parker made to him a detailed statement relating the circumstances surrounding his activities at the Sennett residence on the day of the murder.  May further testified as to the content of that statement.  Because Parker had refused to give a signed statement or to allow May to tape record his statement, May had prepared notes after his interview with Parker, and he used those notes at trial to refresh his memory.  Therefore, whether May's rendition of Parker's statement was credible was an important issue that had to be resolved by the jury.  Parker contends that plain error occurred when the chief

deputy district attorney, Mr. Hudson, made the following closing argument during the guilt phase of the trial:

> "What do we have that would go toward tying John Parker to this crime?  Of course, the most obvious thing we've got is his statement.  We got a confession from him.  And I know good and well that you don't think that that statement came any other way but ... the way Mr. May said it did.  I've known Ronnie May for a long time and worked with him for a long time and, of course, when we put a witness on the witness stand we vouch for [his] credibility just as the defense does when they call a witness.  But I can assure [you] right now that what Ronnie May testified to you about–about anything, but particularly about the statement that I'm talking about right now that was given to him on March the 31st by Mr. Parker.  I can assure you he told you the truth, what was told him by Mr. Parker.  And I don't for any one minute think that any of y'all think he would get up and make it up or fabricate it or anything like that.  But I can assure you, ladies and gentlemen, what he told you is the truth with regard to that statement."

Parker further contends that plain error occurred when the district attorney, Mr. Alverson, made the following closing argument in rebuttal during the guilt phase of the trial:

> "There is no such thing as a case that you couldn't look at long enough and hard enough and find some kind of little inconsistency in the testimony and the reason for that is, I submit to you at least from the state's witnesses they were trying very hard to tell you the truth and the truth as they saw it.  Like Mr. Hudson said, we vouch for the credibility of those witnesses by putting them on the stand and I submit to you that they've told the truth...."

As the Court of Criminal Appeals correctly recognized in its opinion, 610 So.2d 1171, the prosecutors' remarks were an improper attempt to bolster May's testimony by personally vouching for his credibility. Remarks such as these have been soundly condemned. [Citations omitted].  In *United States v. Young*, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985), the United States Supreme Court succinctly stated the dangers inherent in a prosecutor's vouching for the credibility of the prosecution's witnesses:

"The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.  See *Berger v. United States*, 295 U.S. [78], at 88-89, 55 S.Ct. [629], at 633 [79 L.Ed. 1314, 1935]."

However, the Court of Criminal Appeals also correctly recognized that whether the prosecutors' remarks constituted plain error depended on whether those remarks, when viewed in the context of the entire closing argument and in the context of the entire trial, undermined the fundamental fairness of the trial and, thus, constituted a miscarriage of justice.  See *Ex parte Smith*, 581 So.2d 531, 532 (Ala. 1991) (""[p]lain error' exists when the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings...; in other words, 'plain error' exists when a substantial right of the defendant has or probably has been adversely affected").  In *United States v. Young*, *supra*, 470 U.S. at 11, 12, 16, 105 S.Ct. at 1044, 1045, 1047 the Court noted:

"Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.  Instead, ... the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.  In other words, the Court must consider the probable effect the prosecutor's [remark] would have on the jury's ability to judge the evidence fairly....

....

"Especially when addressing [a claim of] plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record.  We have been reminded:

In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not

to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution. *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).

"It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means. As the Court stated in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. [150], at 240, 60 S.Ct. [811], at 852 [84 L.Ed. 1129 1940], 'each case necessarily turns on its own facts.'"

Considering these principles, we cannot say that the prosecutors' remarks rose to the level of plain error. Viewed in context, these remarks, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial. This conclusion is based on our exhaustive review of the record, particularly the prosecutors' remarks during closing argument; May's testimony; Parker's statements and arguments that showed his theory of the case; and the trial court's oral charge to the jury.

Parker's theory of the case was essentially that Charles Sennett had hired Parker and Kenneth Smith to assault and threaten Sennett's wife, but not to kill her; that Parker and Smith had, in fact, gone to the Sennett residence on the day of the murder and had assaulted Mrs. Sennett; that the injuries received by Mrs. Sennett during the assault, although severe, were not necessarily life threatening; that Charles Sennett had come home shortly after the assault and killed his wife; and that Charles Sennett had committed suicide once he became a suspect in the case.

May testified on direct examination, in pertinent part, as follows:

"Q.   If you would – if you have to refer to that to refresh your recollection, do so, but if you would, tell us what you recall him saying to you on that occasion.

"A.   Initially Mr. Parker told me that on March the 18th, 1988, that Billy Gray Williams and Kenneth Smith had used his car to go to the Sennett home to kill Mrs. Sennett. He said he had been given $1,000 cash money to allow them to do that, to use his car. During this portion of the conversation I asked him if he had – was using any kind of drugs and he said he

28

was not that day, on the 31st is when we're talking about. I asked him if he was a drug addict and he said he was, but that he had not used any narcotics on the 31st. I asked him if he was telling me the truth about Mr. Smith and Mr. Williams using his car and he stated that at that time he was. I told him I didn't believe him and he said, 'Okay. I'll tell you the truth.' And he told me that on March the 18th, 1988, that somewhere in the early morning around 9:30 or that proximity, he and Kenneth Smith drove to Mrs. Sennett's home, which is located on Coon Dog Cemetery Road. That they went in his car, a 1978 Pontiac. He stated that on the way down that he shot up 3 cc's of Talwin and that the only weapon they had with them was a survival knife. Mr. Parker stated he drove the car and Kenneth rode in the passenger's side. That he gave Kenny the knife on the way to the house and that Kenny sharpened the knife all the way down there. He stated they went to the driveway, pulled to the rear of the house near the little patio and rear door and that they got out and went to the door. He said he couldn't explain why when Mrs. Sennett came to the door that they didn't jump her then. He just said he knows it didn't happen. He said they asked her something about hunting on the property, that her husband had told them that it would be okay to come down and check out the property. At which time he said she went to the telephone and made a phone call and came back to the door and told them she had talked to her husband and he said it was okay for them to check out the property. He stated that he and Mr. Smith walked into the wooded area behind the house on the back side of the pond and stayed back there for some time. He had no idea how long. He said they came back to the house.

He and Mr. Smith were wearing cotton gloves because it was raining and cool that morning. They went back to the door and asked to use the bathroom and that Mrs. Sennett allowed them to come into the house. John said that when he went into the bathroom he pulled on some cotton socks over his hands and after he left the bathroom that he went through the kitchen and they jumped Mrs. Sennett and starting hitting her trying to knock her down. That he had [taken] along a piece of galvanized pipe to the house with him and that Kenny had the knife. He said that Kenny Smith did all of the stabbing. I asked him that a couple of times and he gave me the same answer both times that Kenny did all the stabbing to Mrs.

Sennett.  He said they hit her with a piece of pipe and with some other things there in the den and on one occasion used this small blue chair to hold her down so they could get her to be unconscious.  When he mentioned the chair he made some sort of indication toward the head and shoulder area.  He stated at one time he hit Mrs. Sennett squarely on top of the head and knocked her back against the rock fireplace and that she was asking them not to hurt her.  He said he did not remember covering Mrs. Sennett with anything while he was there.  He did say they took a VCR and he did state the following day that they–he found a stereo in his car that he threw in the river.  He stated that Kenny took that VCR with him that afternoon.  He said that he did not recall throwing any items into the pond.  That he had upon leaving Mrs. Sennett's home had gotten back into his car and drove to Billy Gray Williams's house located on Tuscaloosa Street in Florence where they collected the remainder of their $1,000 a piece, which his was $900.  He stated he had been given a hundred dollars the day before to go buy a handgun and that he had spent that on drugs to shoot up.  He said they were supposed to make the house appear as though it was a burglary gone bad so they broke out the medicine cabinet windows, the doors in the medicine cabinet, and turned some things over and messed some things up in the house.  He stated that Billy Williams was to hold the money and pay them after the job was done.  He stated that the clothing that he had on [on] the day of the murder, that he had burned them...."

May testified on cross-examination, in pertinent part, as follows:

"Q.    Now, I believe that it is correct that John Parker did not tell you how many times Mrs. Sennett was stabbed?

"A.    No, sir.

"Q.    Nor where?

"A.    No, sir.

"Q.    And I believe that I'm correct that you said that John Parker said that he did not know how [Mrs. Sennett] got covered up?

"A.    To the best of my recollection that's what he said, sir.  That he didn't recall how she got covered up.

"Q.    But when you found her she was covered with an afghan that had, I believe, twenty-three holes, is that correct?

"A.    That's what Mr. Kilbourn stated, yes, sir.

"....

"Q.    And I believe–am I correct that John Parker did not tell you whether or not Mrs. Sennett was alive at the time they left, is that correct?

"A.    No, sir, I was going to get back around to that point when he became upset and said he didn't want to say anything else.  He did not say that, no, sir.

"Q.    Now, did John Parker tell you that they did not turn over the china cabinet?

"A.    Yes, sir, he did.

"Q.    When you arrived there at the scene on March the 18th, 1988, tell the jury again the condition of the china cabinet?

"A.    The china hutch was located as you enter the den, to your right as you enter the area of the den.  The base of the china hutch was still in place.  The upper portion was turned and pushed forward and the upper left hand corner of the hutch as you face it–upper right hand corner as you face it was leaned or propped up on a chair there near the dining room table and all the china and dishes and things were strewn forward toward the den."

Although Parker's attorneys attempted to cast doubt on certain parts of May's testimony by questioning him as to why he had not made more extensive notes following his interview with Parker, they primarily attempted to show that Parker's statement was basically consistent with Parker's theory of the case.  One of Parker's attorneys stipulated during closing argument that Parker had gone to the Sennett residence with Smith on the day of the murder and that Parker and Smith had assaulted Mrs. Sennett.  Parker's attorney argued to the jury that it could find from the evidence presented that Parker was not present at the Sennett residence at the time Mrs. Sennett was killed and that the survival knife was not the murder weapon.  He further argued to the jury that, consistent with May's testimony, Charles Sennett, not Parker, had covered Mrs. Sennett's face with the afghan and then

31

stabbed her to death, and that Charles Sennett had turned over the china cabinet in an attempt to make it appear more convincing that Mrs. Sennett had been killed during a burglary.  Parker's attorney also suggested to the jury that Parker told May that Smith had stabbed Mrs. Sennett because, his attorney contended, Parker knew that he had not done it.  In other words, Parker took the position that his statement to May was based on an assumption that because Mrs. Sennett had been stabbed on the day that he and Smith were at her house, then Smith must have stabbed her.  A careful reading of May's testimony shows that it was not inconsistent with Parker's "assault" theory of the case.

Furthermore, the prosecutors told the jury that its decision should be based on the evidence.  One of Parker's attorneys made the following statement to the jury during his closing argument: "Think about what you've heard form the witness stand.  Remember what I had to say and what Mr. Hudson or Mr. Alverson are going to have to say is not evidence."   In addition, the trial court had given the following instruction to the jury prior to the opening arguments: "[A]n attorney's statements and an attorney's arguments are not evidence and you should disregard any remark, statement, or argument which is not supported by the evidence or by the law as given to you by the court."  Also, the trial court gave the following instruction immediately after the closing arguments:

> "In determining what the true facts are in the case, you are limited to the evidence that has been presented from the witness stand as opposed to matters that have been stated by the attorneys in the course of the trial.  What the attorneys have said both for the state and for the defendant is not evidence in the case.  What they have argued to you at various points in the trial is not evidence.  They have a right and they have a duty at the appropriate time in the trial to comment on the evidence and draw reasonable inferences from the evidence as they argue their respect[ive] positions to you.  What they say is not evidence and you should put what they say in a proper category in your thinking and it should not be in the evidence category, just as the indictment in the case should not be in the evidence category."

We need not decide whether the prosecutors' remarks would have constituted plain error if May had testified that Parker had admitted to killing Mrs. Sennett.  Suffice it to say that we agree with the Court of Criminal Appeals that with regard to May, the remarks, given their context, did not constitute plain error.

Teddy Lynn White, a convicted felon, testified that Parker had tried to buy a gun from him prior to the date on which Mrs. Sennett was murdered.  White further testified that Parker told him at the time that he tried to buy the gun that he (Parker) had been hired to kill someone. One of Parker's attorneys sought to impeach White's testimony by eliciting from White the fact that White had been convicted of burglary; the fact that Parker's live-in girlfriend had had a child by White; and the fact that White was aware that Parker had previously provided information to the police concerning White's criminal activities.  Therefore, whether White's testimony was credible was also an important issue that had to be resolved by the jury.  Again, the Court of Criminal Appeals correctly recognized in its opinion that the prosecutors had made the remarks relating to the truthfulness of the state's witnesses in an improper attempt to bolster White's testimony by personally vouching for his credibility (as well as for May's), but that the remarks did not undermine the fundamental fairness of the trial.  We agree with the Court of Criminal Appeals that with regard to White the prosecutors' remarks did not rise to the level of plain error.  Although we do not condone their remarks, in personally vouching for the credibility of White, neither prosecutor stated the witness's name, as Mr. Hudson did with respect to Investigator May. For this reason, and because of the clear admonitions given to the jury by the attorneys and the trial court to base its decision on the evidence alone and not on the statements made by the attorneys during closing arguments, we conclude that Parker's right to a fair trial was not adversely affected by the prosecutors' remarks.

Although we are acutely aware that "[a] criminal trial does not unfold like a play with actors following a script," *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976), and that an attorney caught up in the passion of a jury argument may occasionally say too much, we nonetheless cannot overlook the fact that prosecutors must avoid making personal guarantees as to the credibility of the state's witnesses.  Remarks such as those made by the prosecutors in this case constitute error and, under the appropriate circumstances, would require the reversal of a conviction.

610 So.2d at 1182-87.

In his reply brief, petitioner argues:

The appellate court found no plain error largely on an analysis which concentrated on the fact that the prosecutor vouched for the credibility of their investigator and that the defense did not contest the confession

33

to which he testified.  *Parker*, 587 So.2d at 1095.  But in fact, the prosecutor vouched for all his witnesses:

> We've got the testimony of Donald Buckman.  Mr. Buckman came in here and testified before you and I can assure you he didn't have anything against John Parker.
>
>                         \*\*\*
>
> ... I submit to you at least from the State's witnesses they were trying very hard to tell you the truth and the truth as they saw it.  Like Mr. Hudson said, we vouch for the credibility of those witnesses by putting them on the stand and I submit to you that they've told the truth, ...

*Id*. at 1094.

Those other witnesses directly attacked Mr. Parker's theory of the case and testified to conversations regarding the acquiring of a handgun, the intent to commit a murder and the fact that it was a contract murder.  None of these issues were conceded by the defense.  This situation is that much more egregious because the State failed to turn over the criminal record of one of the witnesses who testified and perjured himself, one of the witnesses that they vouched for during their argument.  There is a reasonable probability that but for the prejudicial vouching for the Government's witnesses the outcome of the trial would have been different.

(Reply brief, pp. 22-23).

In closing argument, the prosecutor stated about Buckman:

> We've got the testimony of Donald Buckman.  Mr. Buckman came in here and testified before you and I can assure you he didn't have anything against John Parker.  I'm sure if he had the defense would have known about it ....[A]s I recall his testimony he said that around 10:00 to 10:30 the morning that he later found out that night that Mrs. Sennett had been killed, that morning that the Defendant Mr. Parker and Mr. Smith came to his house.  That they came in the brown Grand Prix that he testified belonged to Mr. Parker.  That Mr. Parker was driving and Mr. Smith was on the passenger's side and the purpose of them coming over there was to try to see if he could procure a gun for them.  You remember his testimony.  His conversation was with Smith, but you remember how he went into some detail about how he

34

bent down and talked through the window across over to Mr. Smith.
Across Mr. Parker and over to Mr. Smith, had that conversation about
the gun, and as I recall it he said they were looking for anything from
a .38 to .45.  He also stated he recalled seeing, I believe a 5th of
whiskey in the seat between [them].  I think he went on to say that as
he recollected the seal had not been broken on the bottle at that point
in time.  So that puts these two individuals together that morning by
a third independent witness.  It puts them coming there in the vehicle
belonging to Mr. Parker and asking about a gun.

R-1576-79.

With respect to the comment about vouching for the credibility of the state's witnesses  in

general, the prosecutor stated:

> There is no such thing as a case that you couldn't look at long enough
> and hard enough and find some kind of little inconsistency in the
> testimony and the reason for that is, I submit to you at least from the
> State's witnesses they were trying very hard to tell you the truth and
> the truth as they saw it.  Like Mr. Hudson said, we vouch for the
> credibility of those witnesses by putting them on the stand and I
> submit to you that they've told the truth, but you can't look at this case
> from just one point.  You can't look at this case from some narrow
> angle.  You can't focus in on one small aspect of this case and decide
> the guilt or innocence of the Defendant in this case based on that.
> You've got to look at all of the evidence .  You've got to look at the
> overall picture.  You've got to put it all together like a puzzle and once
> that puzzle is assembled then you must arrive at your verdict.

R-1611.

"To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be

improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant."

*United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991).  "Remarks prejudicially affect the

substantial rights of the defendant when they "so infect[] the trial with unfairness as to make the

resulting conviction a denial of due process."  *Id.*, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

643 (1974).  In making this determination, the question is "whether there is a 'reasonable probability'

35

that, but for the prosecutor's offending remarks, the outcome of the [guilt or] sentencing [proceeding] would have been different. *Id.*, quoting *Williams v. Kemp*, 846 F.2d 1276, 1783 (11th Cir.), *cert. denied,* 494 U.S. 1090 (1990).

The court instructed the jury:

> In determining what the true facts are in the case, you are limited to the evidence that has been presented from the witness stand as opposed to matters that have been stated by the attorneys in the course of the trial. What the attorneys have said both for the State and for the Defendant is not evidence in the case. What they have argued to you at various points in the trial is not evidence. They have a right and they have a duty at  the appropriate time in the trial to comment on the evidence and draw reasonable inferences from the evidence as they argue their respected positions to you. What they say is not evidence
> and you should put what they say in a proper category in your thinking and it should not be in the evidence category....

R-1641-42.

The court further instructed the jury:

> You're the sole judges as to the weight that should be given to all of the testimony in the case. ....

> You ladies and gentlemen of the jury, take the testimony of the witnesses, together with all proper and reasonable inferences therefrom, apply your common sense, and in an impartial and honest way determine what you believe to be the truth. You should weigh all of the evidence and reconcile it, if you can reasonabl[y] do so, but if there is irreconcilable conflict in the evidence you ought to take that evidence which you think is worthy of credit and give it just such weight as you think it is entitled to receive. In doing so you may take into consideration any interest which any witness might have shown to have in the outcome of this case.

> If you believe that any material part of the evidence of any witness was willfully false, you may disregard all of the testimony of such witness.

R-1655-56.

Considering the complete context of the "vouching comments," together with the court's instruction to the jury concerning the jury's weighing of the evidence, this court concludes that the decisions of the Alabama appellate courts that there was no plain error was neither contrary to nor an unreasonable application of *Donnelly v. DeChristoforo* nor were they based on an unreasonable determination of the facts.

C.   Whether the Trial Court's Instruction on Reasonable Doubt
     <u>violated the Sixth, Eighth and Fourteenth Amendments</u>

Petitioner argues it is reasonably likely that the jury applied the challenged jury instruction on reasonable doubt in such a way to deprive him of due process and a fair trial. Specifically, he argues that the challenged instruction equates reasonable doubt and moral certainty.

The trial court gave the following challenged jury instruction on reasonable doubt:

> The phrase "reasonable doubt" is self explanatory and efforts to define it do not always clarify the term, but it may help you some to say that the doubt which would justify an acquittal must be an actual and substantial doubt and not a mere possible doubt. A reasonable doubt is not a mere guess or surmise and is not a forced or capricious doubt. If, after considering all of the evidence in this case you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the Defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair-minded and conscientious men and women would entertain under all the circumstances. Now, you will observe that the State is not required to convince you of the Defendant's guilty [sic] beyond all doubt, but simply beyond all reasonable doubt and to a moral certainty. If, after comparing and considering all the evidence in this case, you're [sic] minds are left in such a condition that you cannot say you have an abiding conviction to a moral certainty of the defendant's guilt then you're not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal.

R. 1639-41.

37

On direct appeal, the Alabama Court of Criminal Appeals dealt with this issue as follows:

> The trial judge did not violate the holding of *Cage v. Louisiana*, 498
> U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), in instructing the jury
> on reasonable doubt.   In that case, the jury was instructed that a
> reasonable doubt "must be such doubt as would give rise to a grave
> uncertainty," that "[i]t is an actual substantial doubt," and that a
> finding of guilt requires a requiring "moral certainty."  498 U.S. at
> ____, 111 S.Ct. at 329 (emphasis omitted).   The objectionable
> language in the instruction involves the combination of the words
> "grave uncertainty," "actual substantial doubt," and "moral certainty"
> which "suggest a higher degree of doubt than is required for acquittal
> under the reasonable doubt standard." 498 U.S. at ____, 111 S.Ct. at
> 329-30.
>
> In this case, the trial judge employed the terms "actual and substantial
> doubt" and "moral certainty" in defining reasonable doubt.  However,
> her instructions did not employ the term "grave uncertainty."  Here, as
> in *Gaskins v. McKellar*, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d
> 728 (1991) (Stevens, J., concurring in the denial of certiorari), the
> instructions do not contain the same flaw as the instructions in *Cage*.
>
>> "We have specifically examined petitioner's claim that the trial
>> court's instruction to the jury on 'reasonable doubt' was 'plain
>> error.'  In that examination, we have compared the trial court's
>> jury instruction regarding 'reasonable doubt' with the
>> instruction recently reviewed by the United States Supreme
>> Court in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112
>> L.Ed.2d 339 (1990), and condemned by that Court as violative
>> of Cage's constitutional rights.  The instruction given in this
>> case does not contain the same infirmity that the Supreme
>> Court of the United States found in the trial court's instruction
>> in *Cage*.  We hold, therefore, that there is no 'plain error'
>> affecting the substantial rights of the petitioner, and thus, no
>> legal reason to grant to petitioner a new trial."
>
> *Ex parte White*, 587 So.2d 1236 (Ala. 1991).

587 So.2d at 1085.

In *Cage v. Louisiana*, 498 U.S. 39 (1990), the Supreme Court  reviewed the following jury

instruction:

"If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or law thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*." 554 So.2d 39, 41 (La. 1989) (emphasis added).

498 U.S. at 40.

The Court held:

In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. *Francis v. Franklin*, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985). The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

498 U.S. at 41.

In *Estelle v. McGuire*, 502 U.S. 62 (1991), the Supreme Court explained how challenged jury instructions in general are to be reviewed:

The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." ... It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of

39

> the instructions as a whole and the trial record. (citations omitted).  In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.

502 U.S. at 72 (citations omitted).

In *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court concluded that there was no *Cage* violation based on references to "reasonable doubt" and "moral certainty" in the following jury instruction:

> "'Reasonable doubt' is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon.  It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, *to a moral certainty*, of the guilt of the accused.  At the same time, absolute or mathematical certainty is not required.  You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken.
>
> You may find an accused guilty upon the *strong probabilities of the case*, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable.  A reasonable doubt is an *actual and substantial doubt* reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture."

511 U.S. at 18.

The Court explained:

> [In *Cage*] we did not hold that the reference to substantial doubt alone was sufficient to render the instruction unconstitutional. ... Rather, we were concerned that the jury would interpret the term "substantial doubt" in parallel with the preceding reference to "grave uncertainty," leading to an overstatement of the doubt necessary to acquit.  In the instruction given in Victor's case, the context makes clear that

40

"substantial" is used in the sense of existence rather than magnitude of the doubt, so the same concern is not present.

In any event, the instruction provided an alternative definition of reasonable doubt:  a doubt that would cause a reasonable person to hesitate to act. ...  [T]o the extent the word "substantial" denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a common sense benchmark for just how substantial such a doubt must be.  We therefore do not think it reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one.

Victor also challenges the "moral certainty" portion of the instruction. ... The moral certainty to which the *Cage* instruction referred was clearly related to the defendant's guilt; the problem in *Cage* was that the rest of the instruction provided insufficient context to lend meaning to the phrase.  But the Nebraska instruction is not similarly deficient.

Instructing the jurors that they must have an abiding conviction of the defendant's guilt does much to alleviate any concerns that the phrase "moral certainty" might be misunderstood in the abstract.  ... The instruction also equated a doubt sufficient to preclude moral certainty with a doubt that would could a reasonable person to hesitate to act. In other words, a juror morally certain of a fact would not hesitate to rely on it; and such a fact can fairly be said to have been proved beyond a reasonable doubt. The jurors were told that they must be convinced of Victor's guilt "after full, fair, and  impartial consideration of all of the evidence."  The judge also told them: "In determining any questions of fact presented in this case, you should be governed solely by the evidence before you.  You should not indulge in speculations, conjectures, or inferences not supported by the evidence. There is accordingly no reasonable likelihood that the jurors understood the reference to moral certainty to allow conviction on a standard insufficient to satisfy *Winship*, or to allow conviction on factors other than the government's proof.  Though we reiterate that we do not countenance its use, the inclusion of the "moral certainty" phrase did not render the instruction given in Victor's case unconstitutional.

511 U.S. at 20-22.

In petitioner's case, the reference to "a reasonably substantial doubt arising from the evidence and remaining after a careful consideration of the evidence" refers to existence rather than magnitude of doubt. Further, the term "reasonable doubt" was defined while the term "moral certainty" was not and the jury was instructed

> "If, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction to a moral certainty of the defendant's guilt then you're not convinced beyond a reasonable doubt, and the Defendant would be entitled to acquittal."

Because the trial court emphasized that the jurors should consider the evidence in determining whether they had a reasonable doubt or "abiding conviction to a moral certainty of the defendant's guilt," there is no reasonable likelihood that the jurors understood the challenged references to allow conviction on a degree of proof below that required by the Due Process Clause.

The state court's decision was not contrary to nor did it involve an unreasonable application of *Cage* and its progeny.

D.     Whether the State Failed to Disclose *Brady* Information Relevant to a Witness's Testimony

On appeal, this issue was addressed by the Alabama Court of Criminal Appeals as follows:

> The appellant contends that the prosecution failed to disclose other convictions of state's witness Teddy Lynn White in addition to his conviction for burglary, and that the prosecution failed to disclose the fact that White was given favorable treatment in exchange for his testimony.
>
> Five days before jury selection proceedings began, the prosecutor copied his entire file and gave it to defense counsel. R. 105-06. See *Ex parte Monk*, 557 So.2d 832 (Ala. 1989). Apparently, either on that occasion or on an earlier date, the prosecutor gave the defense a copy of White's statement containing his admission that he had been convicted for burglary. Immediately before White testified at trial, defense counsel complained that the State had not given the defense

any exculpatory information and that the defense did not have any information "of what [White's] criminal record is."  R.1474.

At trial, White testified as a witness for the State to the effect that a week or two before the murder, the appellant had attempted to purchase a gun from White.  White testified that the appellant said "he was going to kill somebody.  Said that him and Kenny Smith was getting $9000 each."  R. 1482.  On direct examination, White was specifically asked whether and admitted that he had been convicted of a felony "*on more than one occasion*."  R. 1483 (emphasis added).  On cross-examination, White testified that all of his convictions had been for burglary, and that he presently was in prison for third and second degree burglary.   White testified that he had not been promised anything in exchange for his testimony, and that, in fact, while he was in the county jail, "[t]hey [were] talking about putting more charges on [him]."  R. 1487-88.

At the hearing on the motion for new trial it was discovered that, at the time he testified, White was serving time for four convictions, all received on February 23, 1989, in Lauderdale County: burglary in the third degree, unlawful breaking and entering of a vehicle, theft of property in the second degree.  (R. 2667).  It was also discovered that White had a prior burglary felony conviction (R. 1893). for which he had been incarcerated in 1985.

With regard to this issue, the district attorney's position was that the defense knew that White had prior convictions and that the defense could have discovered those convictions on their own.  The district attorney argued that his office "is not obligated to go out and get material or obtain materials for the defense," and that his office "can't be charged with the knowledge or information that every State agency in the State of Alabama has."  R. 1918.

At the hearing on the motion for new trial, it was also established that White, who testified in the appellant's trial on June 6, 1989, was approved for release on the Supervised Intensive Restitution (SIR) Program on June 12, 1989, and was released on the SIR program on June 14, 1989.   The evidence shows that White was originally scheduled for release on May 24, 1989, but that that release was held up on May 19, 1989, which was the same date White gave a statement concerning the appellant to Investigator Ed Sasser at the Elmore Correctional Facility.  The "hold up" was "[a]pparently because of a protest from Mr. Steve Graham who is the District Attorney in Lauderdale County."  R. 1846.  (The appellant was prosecuted by the

district attorney of Colbert County.)  However, White was placed on SIR despite the protest of the district attorney.

A supervision officer for the SIR program testified at the hearing that to his knowledge White was not afforded any kind of "favor" or award in being placed on the SIR program in exchange for his testimony.  He testified that this case "is not unusual.  It is typical of basically the way most of them go."

White testified at the hearing that he was not promised anything for his testimony and that while he was in jail in Lauderdale County the jailer told him that "they was going to bring up some more charges on me."  R. 1876-77.  However, a detective told him that "they were still investigating and if they did come up with some more then he would let me know about it.  And as far as he knew he wasn't going to bring anything against me as far as anything that he had."  R. 1877.  White testified that he was not offered or promised anything in exchange for his testimony.  R. 1884.  Investigator Ray also testified that he was not aware of any promise made to White in exchange for his testimony.

The appellant's discovery rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were not violated because the prosecutor is not required to disclose evidence he does not possess.  "While it is true that under *Brady* the good faith of the prosecutor in not disclosing information is irrelevant, 373 U.S. at 87, 83 S.Ct. at 1196, *Brady* does require that the information requested be known to the prosecution.  *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Antone v. Strickland*, 706 F.2d 1534, 1544 (11th Cir. 1983) (Kravitch, J., concurring specially) [, *cert. denied,* 464 U.S. 1003, 104 S.Ct. 511, 78 L.Ed.2d 699 (1983)].... [T]hat knowledge may be presumed, as when the information is in the prosecutor's files, see *Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400."  *United States v. Walker*, 720 F.2d 1527, 1535 (11th Cir. 1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984).

Here, there is no evidence that the prosecution *suppressed* any evidence whatsoever.  The contention that White's testimony was secured by a promise of favorable treatment in regard to SIR is supported only by a coincidence of facts interpreted through conjecture and speculation.  The defense knew before trial that White was going to testify.  There is no evidence that the prosecution had obtained White's complete criminal record or that the prosecutor had knowledge of all of White's prior criminal convictions.

587 So.2d at 1085-87.

In *Brady v. Maryland*, 373 U.S. 83 (1963) the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "Impeachment evidence, [] as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Impeachment evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 682.   In *United States v. Agurs*, 427 U.S. 97,  103 (1976), the Supreme Court stated that *Brady* applies in situations "involv[ing] the discovery, after trial of information which had been known to the prosecution but unknown to the defense."  Subsequent to the state court's decision in this case, the Court extended *Brady* to apply to evidence "known to police investigators and not to the prosecutor."  *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

In *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), the United States Supreme Court stated: "There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  The prejudice component is satisfied if the petitioner can show that there is a reasonable probability that his conviction or sentence would have been different had the evidence been disclosed.  *Id*. at 296.

There was no evidence that White was released on SIR in exchange for his testimony at petitioner's trial.  (R.1861, 1884).  There is also no evidence that either the prosecutor or a police investigator working with him was aware of the various charges upon which White had been

45

convicted.  In light of the Supreme Court precedent in existence at the time of the decision of the

Alabama Court of Criminal Appeals relating to this issue, the state court's decision was not contrary

to nor did it involve an unreasonable application of *Brady* or its progeny.  Further, it was not based

on an unreasonable determination of the facts in light of the evidence presented in the state court

proceedings.

Although not addressed by the state appellate court,  there is no reasonable probability that

had the evidence of the various felonies for which White had been convicted been disclosed to the

defense, the result of the proceeding would have been different.  White was the prosecution's last

witness.  (R-1488).  His testimony was that  a week or two before the murder, Parker and Kenny

Smith came to his house and  that Smith waited in Parker's car while Parker talked to White.  He

testified that:

> [Parker] was talking about he wanted to buy a gun that he was hired to
> kill somebody ....  Said that him and Kenny Smith was getting
> $9,000.00 each.
>
> Q.     Did he ever indicate who he was going to kill?
>
> A.     No, he just said somebody had hired him and Kenny Smith to kill somebody.
>        And he told me he had been to their house already.  He told me that.
>
> Q.     Did he tell you when he had been to their house?
>
> A.     No, he said the man took him there and him and Kenny  – what they were
>        doing was,  you know, getting close to this person so that she wouldn't be
>        suspicious of them – I shouldn't say she because I didn't know it was a she.
>        But whoever the person was would trust them and they would be walking
>        around on the land and stuff acting like they was hunting."

R- 1479-83.

At best, White's testimony was corroborative of  the earlier testimony of Donald Buckman and

Officer May.

46

Buckman  testified that Parker and Smith came to his house the morning of the murder in Parker's car, that Parker was driving and Smith was in the passenger seat,  that he [Buckman] kneeled next to the driver's side of the car and talked across to Smith who "asked me did I know where he could find a gun at," and that he told Smith that he "didn't know right off." R.1257-62.

May testified concerning Parker's statements to him:

> Initially Mr. Parker told me that on March the 18th, 1988, that Billy Gray Williams and Kenneth Smith had used his car to go to the Sennett home and kill Mrs. Sennett.  He said he had been given $1,000.00 cash money to allow them to do that, to use his car.... I asked him if he was telling me the truth about Mr. Smith and Mr. Williams using his car and he stated that at that time he was.  I told him I didn't believe him and he said, "Okay, I'll tell you the truth." And he told me that on March the 18th, 1988, that somewhere in the early morning around 9:30 or that proximity, he and Kenneth Smith drove to Mrs. Sennett's home. ... That they went in his car a 1978 Pontiac. ... Mr. Parker stated that he drove the car and Kenneth road [sic] in the passenger's side. ... He stated they went to the driveway, pulled to the rear of the house near the little patio and rear door and that they got out and went to the door.  He said he couldn't explain why when Mrs. Sennett came to the door that they didn't jump here [sic] then.  ... He said they asked her something about hunting on the property, that her husband had told them that it would be okay to come down and check out the property.  At which time he said she went to the telephone and made a phone call and came back to the door and told them she had talked to her husband and he said it was okay for them to check out the property.  He stated that he and Mr. Smith walked into the wooded area behind the house on the back side of the pond and stayed there for sometime.  He had no idea how long.  He said they came back to the house. ... They went back to the door and asked to use the bathroom and that Mrs. Sennett allowed them to come into the house.  John said that when he went into the bathroom he pulled on some cotton socks over his hands and after he left the bathroom that he went through the kitchen and they jumped Mrs. Sennett and started hitting her trying to knock her down.  That he had took along a piece of galvanized pipe to the house with him and that Kenny had the knife.  He said that Kenny Smith did all of the stabbing..... That he had upon leaving Mrs. Sennett's home had gotten back into his car and drove to Billy Gray Williams's house located on Tuscaloosa Street in Florence where they collected the remained [sic]

> of their thousand dollar a piece, which his was $900.00.  He stated he
> had been given a hundred dollars the day before to go buy a handgun
> and that he had spent that on drugs to shoot up.

R-1416-20.

Even if White's criminal history had been disclosed and his testimony had been discredited

or disallowed altogether, it is not reasonably probable that the result of the proceeding would have

been different in light of the testimony of Officer May and Buckman.

This court finds no fault with the state appellate court's failure to address the prejudice

component of *Brady* but simply points out that even if the prosecutor's failure to produce White's

criminal history, the specific details of which he was unaware,  could be construed as sufficient to

constitute "suppression,"  Parker could not overcome the prejudice component of *Brady* and *Bagley*.

E.      Whether Petitioner received ineffective assistance of counsel at trial

The principles in *Strickland v. Washington,* 466 U.S. 668 (1984), govern all ineffective

assistance of counsel claims.  The state courts' decisions in this case were not "contrary to" clearly

established federal law as determined by the United States Supreme Court because both the trial court

and the Alabama Court of Criminal Appeals recognized that *Strickland* was the controlling law with

respect to ineffective assistance of counsel claims.

In *Strickland* the United States Supreme Court established a national standard for judging the

effectiveness of criminal defense counsel.  "The benchmark for judging any claim of ineffectiveness

must be whether counsel's conduct so undermined the proper functioning of the adversarial process

that the trial cannot be relied on as having produced a just result." *Id*. at 686.  The Court elaborated:

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment.  Second, the defendant must show

> that the deficient performance prejudiced the defense.  This requires
> showing that counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

In reviewing the performance prong of *Strickland*, the Court stated:

> In any case presenting an ineffectiveness claim, the performance
> inquiry must be whether counsel's assistance was reasonable
> considering all the circumstances.  Prevailing norms of practice as
> reflected in American Bar Association standards and the like . . . are
> guides to determining what is reasonable, but  they are only guides.
> No particular set of detailed rules for counsel's conduct can
> satisfactorily take account of the variety of circumstances faced by
> defense counsel or the range of legitimate decisions regarding how
> best to represent a criminal defendant. Any such set of rules would
> interfere with the constitutionally protected independence of counsel
> and restrict the wide latitude counsel must have in making tactical
> decisions.

*Id*. at 688-89.

In *Crawford v. Head*,  311 F.3d 1288 (11th Cir. 2002), *cert. denied,* 540 U.S. 956 (2003), the

Eleventh Circuit Court of Appeals  elaborated on the *Strickland* performance prong:

> [W]e must bear in mind that the "touchstone of a lawyer's
> performance under the Constitution" is "reasonableness."  *Chandler
> [v. United States]*, 218 F.3d [1305] at 1319 [(11th Cir. 2000)].  As we
> have explained:
>
> > The test has nothing to do with what the best lawyers would
> > have done. Nor is the test even what most good lawyers would
> > have done.  We ask only whether some reasonable lawyer at
> > the trial could have acted, in the circumstances, as defense
> > counsel acted at trial. . . .  We are not interested in grading
> > lawyers' performances; we are interested in whether the
> > adversarial process at trial, in fact, worked adequately.
> >
> > *Waters [v. Thomas]*, 46 F.3d [1506] at 1512 [(11th Cir.
> > 1995)](quoting *White v. Singletary*, 972 F.2d 1218,
> > 1220-21 (11th Cir. 1992)).  Accordingly, "[t]he
> > relevant question is not whether counsel's choices were

49

strategic, but whether they were reasonable." *Putman [v. Head]*, 268 F.3d [1223] at 1244 [(11th Cir. 2001)](quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S.Ct. 1029, 1037, 145 L.Ed.2d 985 (2000). This recognizes that "[t]o uphold a lawyer's strategy, a court 'need not attempt to divine the lawyer's mental processes underlying the strategy,'" but instead must simply determine whether the course actually taken by counsel might have been reasonable. *Id.* (quoting *Chandler*, 218 F.3d at 1315 n. 16).

*Crawford*, 311 F.3d at 1314.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "There is a strong presumption that trial counsel's conduct is the result of trial strategy and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Sinclair v. Wainwright*, 814 F.2d 1516, 1519 (11th Cir. 1987), *(quoting Strickland*, 466 U.S. at 690). "Counsel's competence . . . is presumed and the defendant [petitioner] must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (internal citation omitted). The respondent never acquires the burden of showing competence, rather the petitioner must disprove the presumption of competence. *Chandler v. United States,* 218 F.3d 1305, 1315 (11th Cir. 2000), *cert. denied,* 531 U.S. 1204 (2001). Whether conduct by counsel was a tactical decision is a question of fact. *Collier v. Turpin*, 177 F.3d 1184, 1199 (11th Cir. 1999). "Whether the tactic was reasonable, however, is a question of law. . . ." *Id*. Counsel's challenged conduct is viewed from counsel's perspective at the time of the conduct. *Strickland*, 466 U.S. at 689; *Collier*, 177 F.3d at 1200. It is critical to understand that the petitioner bears the burden of proof in the § 2254 action. In the absence of evidence to the contrary, this court

50

may assume that counsel's decision was strategic. *Birt v. Montgomery*, 725 F.2d 587, 600 (11th Cir.

1984), *cert. denied,* 469 U.S. 874 (1984).

In reviewing the prejudice prong, the United States Supreme Court in *Strickland* stated:

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. . . .
>
> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
>
> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.
>
> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that,

absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland*, 466 U.S. at 693-95.

1.      Whether counsel  was ineffective in presenting the motion to suppress because he failed to demonstrate: (1) that petitioner was arrested at his home, (2)  that the authorities lacked probable cause to arrest him at his home without a warrant, and (3) that there were insufficient intervening events to break the causal relationship between petitioner's arrest and his statement

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> The appellant's claims concerning arrest at home and intervening events are irrelevant because the trial court found that the tip of an anonymous informant was sufficiently corroborated to supply probable cause for the appellant's arrest.  The appellant argues that his counsel should have shown that some of the informant's information was available to "anyone", that it did not evidence involvement in the crime, and that there were inaccuracies in the informant's statement and the warrant affidavit. However, in light of the fact that the informant described in the [sic] detail the VCR stolen during the murder and accurately stated where it could be found, the additional information was not likely to affect the trial court's finding. Therefore, the appellant failed to demonstrate that he had been prejudiced by the alleged errors of his counsel.

Tab #R-61, p.2.  See also, Tab #R-60, pp.8-10.

The underlying claim was presented on direct appeal and decided adversely to petitioner.  See this court's discussion of the underlying claim at Section I, infra.

2.      Whether trial counsel for petitioner was ineffective for not retaining an expert to testify at the suppression hearing concerning petitioner's inability to understand and waive his constitutional rights against self incrimination while under the influence of drugs and alcohol

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> With regard to the claims concerning the expert witness, the appellant wanted to show that the statement he had made to police was not knowing, voluntary and intelligent because of his drug and alcohol use. However, intoxication, short of mania or such impairment of the will and mind that would cause a person to become unconscious of his words, will not render a statement inadmissible. *Nobles v. State*, 541 So.2d 587 (Ala. Cr. App. 1989). None of the three experts the appellant called at the Rule 32 hearing established that such a state existed in the present case.
>
> The appellant's Rule 32 experts also testified that the appellant was suffering from a diminished mental capacity. However, mental impairment is only one factor that affects the validity of a waiver of rights and the voluntariness of a confession. *Dobyne v. State*, 672 So.2d 1319 (Ala. Cr. App. 1994). Here, the appellant had been given his *Miranda* rights and had initiated a conversation prior to giving his statement. An experienced police officer had detected no signs of drug or alcohol intoxication. After considering all the evidence, the trial judge stated that nothing presented at the Rule 32 hearing would have changed her ruling on the appellant's motion to suppress.
>
> The appellant failed to show that he was prejudiced because his counsel did not call expert witnesses to testify at the suppression hearing. He therefore also failed to show that his counsel was ineffective.

Tab #R-61, p.2. See also, Tab #R-60, pp.61-63.

3.    Whether trial counsel for petitioner failed to investigate and present evidence and expert testimony at the sentencing phase of the trial concerning petitioner's brain damage and drug addiction

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> The appellant contends that his counsel was ineffective at sentencing because he failed to investigate and present evidence, including the testimony of an expert, concerning the appellant's brain damage and drug addiction.  He argues that, had his counsel properly prepared, the jury verdict probably would have been unanimous, instead of 10-2, for life imprisonment without parole, and the trial court would have abided by their recommendation.
>
> The appellant also presents the following claims of "severe shortcomings" in the trial testimony: (1) erroneous and baseless testimony by his own psychologist; (2) insufficient exploration of the effects of his head injuries; (3) inadequate testing and testimony from his psychologist; (4) mistaken assertions concerning the effects of Ritalin; (5) failure to closely examine his severe addiction; (6) failure to adequately explore his state of mind at the time of the crime and to seek an expert opinion on the effect of intoxication on intent to kill; (7) failure to present evidence of domination by accomplice Kenny Smith; (8) incorrect testimony by the State's expert; and (9) other unconsidered aspects of the appellant's history.
>
> In order to present a valid affirmative defense, a defendant must show that, at the time he committed the offense, he was suffering from a severe mental disease or defect, § 13A-3-1, *Alabama Code* 1975, or that involuntary intoxication rendered him incapable of appreciating the criminality of his conduct or conforming his conduct to the requirements of law.  § 13A-3-(2)(c), *Alabama Code* 1975.  The appellant called a psychiatrist/toxicologist and 2 neuropsychiatrists, one of whom was an expert in drugs, to testify at the Rule 32 hearing.  They did not establish that the appellant suffered from a mental disease or defect or from involuntary intoxication severe enough to provide a defense.  They also did not establish that he could not form the intent to kill because he was so intoxicated as to be "incapable of discriminating between right and wrong." *Crosslin v. State*, 446 So.2d 675 (Ala. Cr. App. 1983).  The appellant therefore failed to show that he was prejudiced by the absence of the desired expert testimony at trial.

With regard to the claims concerning the trial testimony, the appellant's mother, his former teacher, and a psychologist testified concerning the appellant's head injuries, drug history, low average IQ, poor judgment skills, and low self esteem.  His Rule 32 experts testified that he was impressionable and easily led.  The appellant failed to show, however, that there was any witness who could testify that he was, in fact, dominated by the accomplice.  He also failed to show that his claims of erroneous or omitted witness testimony amounted to anything more than a difference of opinion between experts or cumulative evidence.

The trial court stated in its order that much of the appellant's expert testimony was rebutted by his own actions at the time of the crime, including his "premeditated, purposeful and goal directed plan to engage in the murder ... for pecuniary gain" and his "attempt to destroy evidence and avoid detection and apprehension."  The court found that, even if the testimony desired by the appellant had been presented at sentencing, the court would have imposed the death penalty.  The appellant therefore failed to state a claim of ineffective of counsel under *Strickland v. Washington, supra*.

Tab #R-61, pp.2-3.  See also, Tab #60, pp.51-68.

4.   Whether trial counsel failed to retain a qualified pathologist and failed to adequately cross examine the prosecution's pathologist witnesses at trial

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

The appellant contends that his trial counsel failed to retain and prepare a qualified pathologist and failed to adequately examine the State's pathology witnesses at trial.  He argues that a defense pathologist like his Rule 32 expert could have thwarted the testimony of the State's expert that the victim's wounds were caused by a serrated knife similar to the appellant's and could also have cast doubt on the time of the offense.

However, the testimony desired by the appellant was essentially cumulative evidence.  The appellant concedes that an emergency room doctor who testified for the State and the appellant's own trial pathologist testified that, in their opinion, the appellant's knife was not the murder weapon.  They also agreed that the victim had been stabbed very shortly before the rescue squad arrived.  Based on their testimony,

> the appellant was able to present his theory of his innocence, which was the victim's husband stabbed the victim after he and his accomplices [sic] had assaulted her and left.  The appellant was not prejudiced because his counsel failed to produce an additional expert witness to testify to further evidence which was cumulative.

Tab #R-61, p.3.  See also, Tab #R-60, pp.42-44, 68-69.

> 5.     Whether trial counsel was ineffective for failing to determine and place on the record the fact that petitioner was medicated before and during trial and that such medications affected his ability to participate adequately in his defense and made him appear detached from the trial

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> The appellant contends that his trial counsel erred in failing to determine and state for the record that, before and during trial, the appellant was taking medications prescribed by the jail physician that affected his ability to participate adequately in his defense and made him appear detached.  However, the appellant's own expert testified that the medication error was discovered and corrected more than 20 days before trial.  Moreover, the expert's testimony was that the medication could cause certain side effects, not that it actually had.  [Footnote omitted].   Absent any evidence that the appellant's participation in the trial was affected by medication, his counsel was not ineffective for failing to note the medication for the record.  *Strickland v. Washington, supra,*  requires a showing of prejudice.

Tab #R-61, pp.3-4.  See also, Tab #R-60, pp.68-69.

The appellate court appears to have been under the misunderstanding that all medication ceased prior

to trial when, in fact, according to Rule 32 hearing testimony, Parker continued to receive medication

while on trial.  The trial judge addressed both the issues of the medication error and the continued

medication during trial in the order denying the Rule 32 petition:

> Petitioner states that trial counsel was ineffective for its failure to determine and place on the record medications prescribed to the petitioner while incarcerated before and during his trial (petition II.A.5.(h)(2)).  At the Rule 32 hearing, Dr. Emmanuel Hriso testified

that petitioner was prescribed Hydralazine, an antihypertensive medication, instead of hydroxyzine, an anti-anxiety medication. H. 723. Petitioner's exhibit 4 demonstrates that the medication error was discovered and corrected on May 9, 1989, more than twenty days before trial.

The petitioner also elicited testimony from Dr. Hriso that the correct medication would not have affected his understanding of the trial, but may have made him appear indifferent and tired to the jury. H. 726. However, this Court spoke to and observed the petitioner during trial. R. 1561. This Court finds that while Dr. Hriso speculated to possible effects of the medication, R. 727, no evidence indicated whether the petitioner was made to take this medication, how he believed the medication affected him, or whether he believed he had need for this medication. The Court finds that without evidence of how the correct medication affected petitioner's participation in his own defense, the Court is unable to find the defendant was prejudiced by this. Without a showing of how petitioner was prejudiced, this Court finds that there is similarly no evidence that trial counsel was ineffective for failure to place these medications in the Court record.

Tab #R-60, pp.68-69.

6.     Whether trial counsel failed to adequately investigate the testimony of Teddy Lynn White who allegedly lied about being threatened with new charges and promises of a lighter sentence if he testified at trial and at the hearing on the motion for new trial

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

The appellant contends that his counsel failed to adequately investigate information concerning alleged perjury by Teddy Lynn White, who, the appellant says, lied after he was threatened with new charges and promised a lighter sentence if he testified. White testified at trial that, a week or two before the victim was murdered, the appellant and an accomplice came to his house and he sold the appellant a gun while the accomplice remained in the car. White denied that there had been any "deal" in exchange for his testimony.

The appellant's counsel subsequently learned that White had been placed in the SIR program shortly after he testified. The counsel then included in his motion for new trial the allegation of a deal. At the hearing on the motion, the SIR officer and White denied that there was

anything improper in White's placement in the program. White was called to testify again at the Rule 32 hearing. He initially refused to answer questions and the trial judge, with the consent of the parties, consulted alone with him. White then testified that he had not been offered anything for his testimony, although, he said, the prosecutor had told him that he would face up to six new charges if he did not testify.

The appellant argues that the trial court went beyond the agreed scope of questioning during the meeting in chambers and thereby violated his right to confrontation. However, the trial court offered to remove the interview with White from the record, and the appellant declined. The appellant has failed to show that he was prejudiced by the trial court's questioning.

The appellant also has not shown that his counsel was ineffective for failing to further investigate this matter. The claim of perjury was raised on direct appeal, and this court found that White stated at trial that he was not promised anything in exchange for his testimony and that "[t]hey [were] talking about putting more charges on [him]." This court further found that any contention that favorable treatment was promised with regard to SIR was conjecture and speculation. White's testimony at the Rule 32 hearing was not new evidence but was instead essentially similar to his previous statements. The appellant has offered no evidence that any further investigation by his counsel was warranted. He therefore has failed to show either defective performance or prejudice, as required by *Strickland v. Washington,*, *supra*.

Tab #-61, p.4. See also, Tab #R-60, pp.7-8.

This court notes that the appellate court decision is inaccurate in only one respect–the court misstates the substance of White's testimony at Parker's trial. White actually testified that a week or two before the murder, Parker, accompanied by Smith, who waited in the car, underlined_attempted to purchase a gun from White. (R. 1479-82). On direct appeal, the Alabama Court of Criminal Appeals accurately portrayed the substance of White's testimony. 587 So.2d at 1085. The appellate court correctly stated that White has consistently denied being offered "a deal" at trial, in a hearing on a motion for new trial and in a Rule 32 hearing.

The underlying claim was presented as a Brady claim on direct appeal and decided adversely

to petitioner.  See this court's discussion of the Brady claim at section D, supra.

     7.     Whether trial counsel failed to adequately inform petitioner of his right to independent
counsel when counsel asked to be relieved because of inadequate experience and
reluctance to represent petitioner and failed to present witnesses in their motion to be
relieved or at a subsequent hearing ordered by the Court of Criminal Appeals

This claim was not addressed by the appellate court on appeal from the denial of the Rule 32

petition; however, the trial court addressed this claim in the order denying the Rule 32 petition:

> The petitioner's claim that trial counsel failed to "adequately" inform
> petitioner of his right to independent counsel when counsel asked to
> be relieved of representation due to inadequate experience (petition
> II.A.5.(b)(8)) was raised and addressed on appeal.  The appellate court,
> as noted above, found that petitioner's trial counsel was competent and
> had the requisite experience required by statute.  *Parker v. State*, 587
> So.2d at 1101-1103.  This Court was not privy to any conversation
> between trial counsel and petitioner regarding the information
> provided the petitioner regarding the right to independent counsel.
> This Court finds that no evidence of the "adequacy" of such
> information provided the petitioner was presented at the Rule 32
> hearing, and thus under Rules 32.3 and 32.6, A.R.Cr.P., the petitioner
> wholly failed to meet its burden of proof on this issue.

Tab #R-60, p.47.

     8.     Whether trial counsel Hamby's conflict of interest based on prior legal representation
of the victim's husband violated petitioner's Sixth Amendment right to counsel

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

concluded that this was one of petitioner's claims that was not "sufficient to show that his counsel

was ineffective.  In a death penalty case, the appellant must show that, but for the errors, the sentencer

would have concluded that the balance of aggravating and mitigating circumstances did not warrant

the death penalty *Strickland v. Washington, supra.*"  (Tab #R-61, pp.4-5).  In addition, the trial court

found that no conflict of interest existed because Mr. Sennett was deceased and the criminal case

"was not a matter which involved the same or similar matters as the previous representations of Charles Sennett, not a matter using information relating to the representation to the disadvantage of the former client."  Tab #R-60, p.22.

9.  Whether trial counsel failed to articulate a coherent theory in closing argument

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals concluded that this was one of petitioner's claims that was not "sufficient to show that his counsel was ineffective.  In a death penalty case, the appellant must show that, but for the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant the death penalty.  *Strickland v. Washington, supra.*"  (Tab #R-61, pp.4-5.  See also, Tab #R-60, pp.20-21).

The trial court stated in the order denying the Rule 32 petition:

> As the Court on appeal noted, "Parker's theory of the case was essentially that Charles Sennett had hired Parker and Kenny Smith to assault and threaten Sennett's wife, but not to kill her, that Parker and Smith had, in fact, gone to the Sennett residence on the day of the murder and had assaulted Mrs. Sennett; that the injuries received by Mrs. Sennett during the assault, although severe, were not necessarily life threatening; that Charles Sennett had come home shortly after the assault and killed his wife; and that Charles Sennett had committed suicide once he became a suspect in the case."  Ex parte Parker, 610 So.2d at 1180.
>
> ....
>
> The Court also notes that failing to convince the jury of the defense's theory does not make trial counsel inadequate, ineffective or incompetent.

Tab # 60, p. 21.[6]

---

[6]     Parker argues that counsel said Charles Sennett did not plan to have his wife killed and then failed to explain how the plan evolved so that Sennett did kill his wife.  In closing argument, defense counsel argued that Sennett paid Parker and his accomplices to have Mrs. Sennett beaten which Parker and Smith did.  Counsel argued that the motive was to frighten Mrs. Sennett so that he could continue to control her and prevent her from leaving him.  Counsel stated that Sennett did not plan to have his wife killed and didn't plan to kill his wife and then

10. Whether trial counsel was ineffective in failing to object to jury charges precluding manslaughter, misstating the law regarding conspiracy to commit murder and capital murder, and instructing on reasonable doubt

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals concluded that this was one of petitioner's claims that was not "sufficient to show that his counsel was ineffective. In a death penalty case, the appellant must show that, but for the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant the death penalty. *Strickland v. Washington, supra.*" Tab #R-61, pp.4-5. See also, Tab #R-60, p.29. See also discussion at section C regarding reasonable doubt charge and discussion at section M regarding failure to give lesser included offense instructions.

11. Whether trial counsel was ineffective at trial for failing to object to prosecutorial misconduct in closing argument for vouching for the credibility of state's witnesses

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals held that this claim was insufficiently specific for the court to consider on appeal under Rule 32.6(b), Ala. R.Crim.P.; however, the court further held that:

> ... The appellant's claim of improper prosecutorial comment is insufficient to establish ineffective assistance of counsel. The prosecutor's remarks were reviewed under the plain error rule and were found to be not so prejudicial as to undermine the fairness of the trial. The appellant therefore failed to show that, but for his counsel's failure to object, the outcome of the trial probably would have been different and the death penalty probably would not have been imposed. *Strickland v. Washington, supra.*

---

continued:

"But why does he do it? Because remember he's a manic depressant. He has a problem. He comes [home] and finds his wife and it hadn't been somebody waving the knife and tearing things up and running [around] and scaring his wife. It's been much worse than he [ever] imagined it would be and he knows his wife knows that he had this done to her. What can he do? He looses [sic] it, he covers her and he stabs her with another knife, not this knife."

R-1593-1603.

Tab #R-61, p.5.  See also, Tab #R-60, pp.19-20.

See also this court's discussion of the underlying claim of prosecutorial misconduct in section B.

12.     Whether trial counsel was ineffective at trial for failing to object to *Doyle v. Ohio* violations where state's witness Ronnie May's commented on petitioner's refusal to speak and invoking his Fifth Amendment right to remain silent

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held that this claim was insufficiently specific for the court to consider on appeal under Rule 32.6(b),

Ala. R.Crim.P.  The court further held that "[h]is claim of *Doyle* violations is without merit, as neither

of the statements cited by the appellant used his silence as evidence of his guilt."  Tab #R-61, p. 5.

See also, Tab #R-60, p.46, n.4.

13.     Whether trial counsel was ineffective for failing to seek additional funding when the original investigator approved for funding failed to provide adequate work product

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> The appellant contends that his trial counsel was ineffective for failing to adequately utilize the investigator funded by the trial court and for failing to seek additional funding when the investigator's work was left uncompleted.  However, the appellant admits in his brief to this court that his counsel took over the work of the investigator.  The appellant failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington*, *supra*, because he has not pleaded or shown that his defense was prejudiced by his counsel's action.

Tab #R-61, p.5.  See also, Tab #60, p.15.

14.     Whether trial counsel was ineffective for failing to advise petitioner of his right to testify at the suppression hearing and to further advise him that by doing so he would not waive his right to remain silent at trial

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> The appellant contends that his counsel was ineffective for failing to advise him that he could testify at the suppression hearing without waiving his right to remain silent at trial.  He argues that his testimony would have been helpful because he could have testified to his ingestion of "extensive amounts" of marijuana and beer.
>
> However, the appellant did not propose to testify that he was intoxicated [to] a degree that would have rendered his statement inadmissible.  See *Nobles v. State*, *supra*.  He therefore failed to plead or show that, had his counsel told him that he could testify, the outcome of the trial probably would have been different.

Tab #R-61, p.5.  See also, Tab #R-60, pp.47-48.

15.   Whether trial counsel was ineffective by failing to competently cross-examine Donald Buckman as to when the conversation between Buckman and co-defendant Kenneth Smith took place and by failing to object to the alleged hearsay testimony concerning the conversation during which petitioner was present but did not participate

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> The appellant contends that his counsel was ineffective for failing to competently cross-examine State's witness Donald Buckman with regard to his conversation with the accomplice.  He argues that the counsel made no attempt to discredit Buckman concerning where the conversation took place or whether he was certain of the day of the week.  He also argues that the counsel failed to object to an allegedly prejudicial hearsay conversation between Buckman and the accomplice.
>
> The appellant failed to show that he was prejudiced by the alleged errors of his counsel.  Buckman testified at trial that his conversation occurred on the day of the murder, when he was not at work.  He stated at the Rule 32 hearing that he believed that the day was Saturday; however, the State introduced evidence that he had also been "off" on Friday, the day of the murder.  Buckman's testimony was insufficient to show that, had the appellant's counsel cross-examined him more aggressively, the outcome of the trial probably would have been different.  The appellant's claim concerning the alleged hearsay conversation also was insufficient, as he failed [to] establish that the conversation was, in fact, hearsay or that it was prejudicial to the appellant.  *Strickland v. Washington, supra.*

Tab #R-61, pp.5-6.  See also Tab #R.60, pp.26-27 and pp. 45-47.

     16.     Whether trial counsel was ineffective during jury selection by rehabilitating juror Whilhite who expressed a strong view in favor of capital punishment, by failing to move to strike the jury array due to underrepresentation on the basis of race and gender and by failing to strike juror Mansell for cause.

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

> The appellant contends that his counsel was ineffective during jury selection.  He argues that the counsel should have challenged Jurors Wilhite and Mansell for cause.  ...  He also argues that his counsel should have moved to strike the jury, due to underrepresentation on the basis of race and gender.

> However, Juror Wilhite informed the trial court that he would follow the law and the court determined that, although Juror Mansell had seen the victim brought into the hospital, he had no predisposition toward the case.  A proper challenge for cause exists only when the prospective juror's opinion or bias is so fixed that he cannot ignore it and try the case impartially on the law and the evidence.  *Ex parte Rutledge*, 523 So.2d 1118 (Ala. 1988).  As there was no such showing of fixed opinion or bias in the present case, the appellant cannot show that he was prejudiced by his counsel's failure to challenge these two jurors.

> [H]e stated no factual basis for his claim of underrepresentation of race and gender.  The appellant failed to show either deficient performance by his counsel or prejudice to his defense with regard to these claims.  *Strickland v. Washington, supra.*

Tab #R-61, p.6.  See also, Tab #R-60, pp. 3,31-33.  See also, discussion in Section G.

     17.     Whether trial counsel was ineffective for failing to place on the record, during the motion for change of venue, an *ex parte* discussion with the trial judge and district attorney during which the judge indicated her intention to grant a change in venue and that the hearing on the motion would be a mere formality.

On appeal from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

held:

The appellant contends that his counsel was ineffective for failing to place on the record an *ex parte* discussion with the trial judge and off-the-record discussion with the prosecutor, wherein, he says, the judge clearly indicated her intention to grant a change in venue and indicated that the hearing on the motion would be a mere formality.

However, the appellant's counsel testified that he had merely assumed that the judge intended to change venue. He made this assumption, he said, because the trial judge was present during an informal discussion of the difficulties of moving accomplice Kenny Smith's trial to Birmingham and then, *sua sponte*, the judge called a hearing on a change of venue in the appellant's trial. The trial court noted in her order on the appellant's petition that no such conversation concerning a change of venue ever occurred. The appellant has not shown that his counsel's performance was deficient because the counsel failed to put an erroneous claim on the record.

The appellant also argues that his counsel was ineffective for failing to adequately press for a change of venue and failing to produce the necessary experts on pretrial publicity. However, this court found on direct appeal that the trial court's refusal to move the appellant's trial was based on all the evidence, exhibits, testimony, and arguments that had been offered in Smith's venue hearing. This court further found that the court's refusal to grant the change was not an abuse of discretion. As the appellant has not shown that he was prejudiced by the actions of his counsel, he has failed to state a claim under *Strickland v. Washington*, *supra*.

Tab #R-61, p.6. See also Tab R-60, pp.3-6; R. 32, TR. 63-64. See also discussion in Section J.

    18.    Whether trial counsel was ineffective for failing to make a record, to object or to provide adequate representation in eight additional ways

In the amended petition, petitioner identifies nine alleged inadequacies of counsel:

[i]    At one point, Mr. Heflin attempted to make a motion concerning his belief that the Petitioner ha[d] been brought into court in shackles in front of prospective jurors. Instead of continuing with his objections, Heflin accepts at face value the assertions of the District Attorney and investigators that Mr. Parker was not seen. R-719.

[ii]    Trial counsel's [sic] failed to object to the introduction of wrongdoing not the subject of a criminal conviction. R-1770.

[iii]    Trial counsel failed to object adequately to the trial court's override of the jury's recommendation of life without parole (Petition II.A.5(e)(4)).

[iv]    Trial counsel failed to articulate to the sentencing court reasons why Petitioner's life should be spared.

[v]    Trial counsel allowed peremptory challenges to be done off the record. R-904.

[vi]    Trial counsel failed to object to investigator Ronnie May, a key prosecution witness, from being present throughout the trial proceedings, (petition II.A.5(h)(1)).

[vii]    Trial counsel failed to object when the district attorney provided unsworn and unconfronted testimony whether or not the petitioner had been informed of his right to refuse to provide blood samples of saliva to the State (petition II.H.1),

[viii]    Trial counsel failed to file a motion or make appellate arguments attacking the constitutionality of imposing the death penalty on persons with mental infirmities like those of Mr. Parker (petition II.A.5.(e)(1)).

[ix]    The lack of such compelling evidence, which would have been readily available to trial counsel, reflected their inadequate representation. Had counsel presented such testimony, the results of the trial would have been different.

Amended petition, pp.124-25.

The Alabama Court of Criminal Appeals held with respect to these claims:

> A review of the record reveals that none of the appellant's claims are sufficient to show that his counsel was ineffective. In a death penalty case, the appellant must show that, but for the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant the death penalty. *Strickland v. Washington, supra.*

Tab #R-61, p.5.

The trial court made specific findings with respect to each of these claims.

66

[i]  Heflin's failure to pursue a motion concerning his belief that the Petitioner
has been brought into court in shackles in front of prospective jurors.

The trial court stated in the order denying the Rule 32 petition:

> Petitioner claims trial counsel was ineffective due to the lack of
> challenge at trial and on direct appeal that security measures taken
> [sic] trial prejudiced the petitioner and destroyed juror impartiality
> (petition II.A.5.(d)(3) and (g)(2)).  The Court finds that the measures
> taken at trial were pursuant to the motion of trial counsel to limit the
> visibility of restraints on the petitioner.  R. 2078-2079.  The Court
> granted this motion.  R.. 2125-2126.  This Court finds that no evidence
> concerning destruction of juror impartiality was presented during the
> Rule 32 hearing.  Not one juror was called as a witness to testify as to
> what the jury did or did not see or hear.  Further, no evidence was
> presented that, assuming the jury could see or hear petitioner's
> restraints, demonstrated the effect this had on the jury.  The Court
> finds that under Rule 32.6, this claim must be denied.

Tab #R-60, p.49.

This court notes that Rule 32.6 requires:

> The petition must contain a clear and specific statement of the grounds
> upon which relief is sought, including full disclosure of the factual
> basis of those grounds.  A bare allegation that a constitutional right has
> been violated and mere conclusions of law shall not be sufficient to
> warrant any further proceedings.

Nevertheless,  petitioner was provided an evidentiary hearing on the Rule 32 petition and failed to

present any evidence or testimony with respect to this claim.

[ii]  Trial counsel's failure to object to the introduction of
wrongdoing not the subject of a criminal conviction.  R-1770.

The trial court in the order denying the Rule 32 petition observed:

> Petitioner's claim that trial counsel failed to object to the introduction
> and consideration of wrongs not the subject of criminal convictions
> (II.A.5.(f)(2)) is erroneous.  This issue was raised on direct appeal, and
> the appellate court remanded the case to this Court for resentencing
> with instructions to consider the petitioner's lack of convictions as a
> mitigating circumstance.  *Parker v. State*, 587 So.2d at 1100.  This

67

court did so and the appellate court held that "[t]he amended order of the trial court is proper, is supported by the record, and fully complies with the requirements of sec. 13A-5-47(d)." *Parker v. State*, 610 So.2d at 1172-1173. Thus, any failure to object to the court's consideration of wrongs not the subject of criminal convictions has already been cured by the appellate courts of this state and thus would have no effect on the ultimate sentence imposed in this case.

Tab #R-60, p.27.

See this court's discussion of underlying claim at Section H, *supra*.

[iii]   Trial counsel's failure to object "adequately" to the trial court's override of the jury's recommendation of life without parole (Petition II.A.5(e)(4)).

The trial court stated in the order denying the Rule 32 petition:

Petitioner's claim that trial counsel failed to object adequately to this Court's rejection of the jury verdict for life without parole (petition II.A.5(e)(4)) is incorrect. This issue was addressed on appeal and this Court's rejection of the jury verdict held to be proper. This Court notes that the sentencing opinion of this court was upheld by the appellate court. See A.16., *supra*. Additionally, this Court finds that trial counsel raised this very point in its motion for new trial. R.2181.

Tab #R-60, p.27.

The underlying claim was addressed in Section H of this opinion.

[iv]   Trial counsel's  failure to articulate to the sentencing court reasons why Petitioner's life should be spared.

The trial court dealt with this issue in the order denying the Rule 32 petition:

Petitioner's allegation that trial counsel failed to articulate reasons why petitioner's life should be spared (II.A.5.(f)(3)) is without merit. A review of the sentencing hearing testimony and the closing arguments presented thereafter reveal that trial counsel presented every factor petitioner now contends was not, but should have been, argued before this Court. The Court granted petitioner's motion limiting the District Attorney from referring to the atrociousness or viciousness of the victim's death. R. 1767-1768. The prosecutor, in his closing arguments, pointed out the mitigating circumstances presented, including the age of the Defendant, the lack of any significant criminal

68

> history, and the possibility of diminished mental capacity.  R. 1769.
> The prosecutor continued his argument by recognizing that "what's
> really been proven in this case is that John Parker had problems.  That
> he was of low average or borderline intelligence....  That he had a drug
> problem.  That he had problems controlling his emotions.  That he had
> problems, he had problems."  R. 1774.  The defendant's attorney then
> argued to the jury: "There was never anything normal.  Not from when
> he was little.  And they can talk all day long and make great speeches,
> but I just don't believe this boy is a candidate for the electric chair."
> R. 1779.  This Court finds that petitioner's trial counsel did an
> excellent job establishing why petitioner's life should be spared, as
> proven by the jury's 10-2 vote for life without parole.

Tab #R-60, pp.49-50.

[v]     Trial counsel allowed peremptory challenges to be done off the record.  R-904.

The trial court stated:

> The petitioner claims he was prejudiced on appeal by the failure to
> transcribe all court proceedings fully (petition II.A.(5)(d)(2) and II.Q.).
> This Court notes that this claim too is being raised for the first time in
> the Rule 32 petition, and that no objections were raised at trial or
> claims made on appeal.  This Court also notes that no evidence of this
> claim was presented at the Rule 32 hearing.  Under Alabama Rules of
> Criminal Procedure Rule 19.4(a), there is no requirement that the court
> reporter record and transcribe bench conferences, sidebar discussions
> or the actual striking of the jury.   See *Roberts v. State*, WL 272419 at
> 18.  The Court also notes that no specifically requested material by any
> of petitioner's counsel is stated to be untranscribed.

Tab #R-60, p.36.

[vi]    Trial counsel's failure to object to investigator Ronnie May, a key
        prosecution witness presented throughout the trial proceedings

The trial court stated in the order denying the Rule 32 petition:

> The question of whether the prosecutor engaged in misconduct in
> allowing Investigator Ronnie May, a witness, to be present at the
> prosecution's table throughout the entire trial proceeding (petition
> II.A.5.(h)(1) and II.H.2.) and whether trial counsel failed to object
> thereto were not raised at trial nor on appeal and are therefore barred

from being raised now.  However, this Court finds that even if this issue had been previously raised, no error occurred.

Under Rule 615, Alabama Rules of Evidence, every party to litigation may have a representative present who is exempt from the exclusionary rule.  Rule 615(2) A.R.E.  Likewise, a person who's [sic] presence is shown by a party to be essential to the presentation of the party's cause is exempt from exclusion.  Rule 615(3) A.R.E.  Under either of these subsection, the state's action in allowing the investigating officer to be present throughout the trial was clearly appropriate.  See also *Ex parte Lawhorn*, 581 So.2d 1179 (Ala. 1991) [Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of a trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial]; sec. 286.01, *McElroy's Alabama Evidence.*

Tab #R-60, p.30.

[vii]   Trial counsel's failure to object when the district attorney allegedly provided unsworn and unconfronted testimony whether or not the petitioner had been <u>informed of his right to refuse to provide blood samples and saliva to the State</u>

The trial court dealt with this claim in the order denying the Rule 32 petition in the following

manner:

The Court finds that the petitioner has provided no evidence concerning whether or not the petitioner had been informed of his right to refuse to provide samples of blood and saliva to the state (petition II.H.1.).  The Court further finds a lack of any evidence presented at the Rule 32 hearing regarding whether or not the prosecutor provided "unsworn and unconfronted testimony" regarding petitioner's right to refuse to provide the same.

. . . .

The petitioner's allegations that the district attorney provided unsworn and unconfronted testimony concerning whether or not the petitioner had been informed of his right to refuse to provide samples of blood and saliva to the state (petition II.H.1.) were not raised at trial nor on appeal.  This Court finds that this claim is barred form further consideration by this Court under Rule 32.2(3) and (5), A.R.Cr.P.

Tab #60, pp. 29-30,41.

[viii]   Trial counsel's failure to attack the constitutionality of
<u>imposing the death penalty on persons with mental infirmities.</u>

In the order denying the Rule 32 petition, the trial court stated:

> The petitioner claims that trial counsel was ineffective due to its
> failure to file a motion attacking the constitutionality of the death
> penalty for "someone like Mr. Parker" (petition II.A.5.(e)(1)).  As
> previously found by this Court, this petitioner was competent to stand
> trial and had the capacity to understand the wrongfulness of his
> actions. (*Supra* A.6. and A.7.).  All mitigating circumstances required
> of this court to be considered before sentencing were so considered.
> This facts of this particular case are not all that unusual regarding the
> mental state or mental capacity of petitioner.  See, e.g. *Dobyne v.
> State*, 672 So.2d 1319.  This Court finds this contention to be without
> merit.  See also *Williams v. State,* 1996 WL 497198 [death penalty
> imposed on individual claiming mental deficits].

Tab #R-60, pp.41-42.

Having reviewed the trial transcript and Rule 32 evidentiary hearing transcript as well as the

state courts' decisions, the court concludes that the decisions of the state courts on the issue of

ineffective assistance of counsel were not contrary to or an objectively unreasonable application of

*Strickland v. Washington* nor were they based on an unreasonable determination of the facts in light

of the evidence presented in the state court proceedings.

F.      <u>Whether Parker's Constitutional Rights were Violated When Authorities Medicated Him</u>

In his amended habeas petition, petitioner argues he was deprived of his rights to due process,

confrontation and counsel under the Fifth, Sixth and Fourteenth Amendments when state authorities

medicated him without informing counsel and the court.  Specifically, he alleges that prior to and

during trial he was given hydroxyzine four times a day and that the effect of the medication was to

make him feel "kinda doped up" during the trial, to make him look apathetic, indifferent and tired,

and to impair his ability to consult with his attorney.

71

This claim was not raised as an independent claim in state court.  Rather, it was raised as an instance of ineffective assistance of counsel.  In *Teague v. Lane*, 489 U.S. 288 (1989), *reh. denied*, 490 U.S. 1031 (1989), the Supreme Court held that the procedural default rule applies where a claim has never been presented to the state courts.

"When a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice."  *See Wilson v. Jones*, 902 F.2d 923, 925 (11th Cir. 1990), *reh. denied*, 927 F.2d 615 (11th Cir. 1991), *citing Bennett v. Fortner*, 863 F.2d 804, 806 (11th Cir.), *cert. denied*, 490 U.S. 1071 (1989); *see also Engle v. Isaac*, 456 U.S. 107, 129 (1982).

Petitioner ignored respondent's assertion of procedural default and has therefore failed to make any showing of cause and prejudice for his failure to present this claim as an independent constitutional claim in state court.  No further review of this claim is necessary.

The court notes that this claim has also been presented and addressed in this court in the context of the ineffective assistance of counsel claim.  See discussion at E.(5)

G.      Whether the Failure to Strike Venirepersons who Could Not be Impartial with Regard to Guilt and/or Sentencing was a Violation of the Sixth, Eighth and Fourteenth Amendments

Petitioner alleges that trial counsel moved to strike prospective jurors Almon Whitehead, Ovie Crosswhite, and Elmer Watkins for cause.  He alleges that Whitehead should have been struck due to his knowledge about facts of the case and his opinion that petitioner was involved and that the trial court's refusal to strike him for cause violated his rights under the Sixth and Fourteenth Amendments.  He argues that Crosswhite and Watkins should have been struck due their bias in favor of the death penalty and that the trial court's refusal to strike them for cause violated his rights under the Sixth, Eighth and Fourteenth Amendments.

72

This issue was raised and addressed on direct appeal.  The Alabama Court of Criminal Appeals observed that the jurors indicated that they could set aside their views and base their decisions on the evidence presented at trial and what the judge said was the law. The court concluded:

> The trial judge did not commit error in denying the appellant's challenge for cause to venire members Almon Whitehead, Ovie Crosswhite, and Elma Watkins.  Defense counsel was allowed to voir dire each of these venire members individually outside the presence and hearing of the other members.
>
> Whitehead was a reserve state trooper who had received some information connected with the case from a friend who was a nurse at the emergency room when the victim's body was brought in and from a friend who was with the Alabama Bureau of Investigation and who took part in the investigation of the murder.  Defense counsel was permitted to explore the content of what Whitehead knew and what he had been told.  On examination, Whitehead made it clear that what he had been told would not influence his judgment and that his judgment would be based on the evidence presented at trial.  The appellant argues that his "assurances are simply not credible."  Appellant's brief at 51.
>
> Watkins was a retired Sheffield police officer who expressed his opinion that capital punishment should be imposed for any kind of murder.  However, he testified that he could base his decision on the evidence and "go with what the Judge said the law was."
>
> Crosswhite expressed his personal views favoring capital punishment but indicated that he could set those views aside and "follow the law" as instructed by the trial judge.
>
> "[A] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence." *Ex parte Rutledge*, 523 So.2d 1118, 1120 (Ala. 1988).  "[A] trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear showing of an abuse of discretion by the trial court." *Rutledge*, 523 So.2d at 1120.  Here, there is no showing that any of these three veniremembers had such a fixed opinion that it would bias the verdict or influence the decision.  *Siebert v. State*, 562 So.2d 586, 595-96 (Ala. Cr. App.

1989), affirmed, 562 So.2d 600 (Ala.), *cert. denied,* 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990).

> "In challenging a juror for cause, the test to be applied is that of probable prejudice....  While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court....  This Court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised....  A reversal is not appropriate absent abuse of this discretion....  "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence....  This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge.  Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence."

*Knop v. McCain*, 561 So.2d 229, 232 (Ala. 1989).  See also *Wood v. Woodham*, 561 So.2d 224, 227 (Ala. 1989).  "Thus, even though a prospective juror admits to a potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge's refusal to grant a motion to strike for cause is not error."  *Perryman v. State*, 558 So.2d 972, 977 (Ala. Cr. App. 1989).

We recognize that there are occasions where a juror's claim of freedom from prejudice and impartiality cannot be accepted and should not be believed.  See *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984).  "[T]he simple extraction of an affirmative response from a potential juror does not necessary absolve that juror of probable prejudice."  *Woodham*, 561 So.2d at 228.  However, we do not consider this to be such an occasion.  Our review of the questioning of these three venire members by the trial judge, defense counsel, and the prosecutor convinces this court that each challenge for cause of these three venire members was properly denied.

> "The qualification of a juror is a matter within the discretion of the trial court.  *Clark v. State*, 443 So.2d 1287, 1288 (Ala. Cr. App. 1983).  The trial judge is in the best position to hear

> a prospective juror and to observe his or her demeanor.  A trial
> judge's rulings on a juror's qualification are entitled to great
> weight on appeal and will not be disturbed unless clearly
> shown to be an abuse of discretion."

*Ex parte Dinkins*, 567 So.2d 1313, 1314 (Ala. 1990).

587 So.2d at 1083.

Petitioner relies upon *Morgan v. Illinois*, 504 U.S. 719 (1992) to support his claim that Crosswhite and Watkins should have been struck for cause due to their clear bias in favor of the death penalty which would interfere with their abilities to be impartial jurors.  *Morgan v. Illinois* was decided after the appellate court's decision on this issue.  Moreover, *Morgan v. Illinois* is distinguishable from this case.  In *Morgan v. Illinois*, the Supreme Court  had to review the constitutional adequacy of the voir dire.  In this case, both defense counsel and the prosecutor had ample opportunity to question the jurors on voir dire concerning their position on the death penalty. (R. 788-98, 825-31).   In *Morgan v. Illinois*, the Court  stated:

> A juror who will automatically vote for the death penalty in every case
> will fail in good faith to consider the evidence of aggravating and
> mitigating circumstances as the instructions require him to do.  Indeed,
> because such a juror has already formed an opinion on the merits, the
> presence or absence of either aggravating or mitigating circumstances
> is entirely irrelevant to such a juror.   Therefore, based on the
> requirement of impartiality embodied in the Due Process Clause of the
> Fourteenth Amendment, a capital defendant may challenge for cause
> any prospective juror who maintains such views.  <u>If even one such
> juror is empaneled and the death sentence is imposed, the State is
> disentitled to execute the sentence.</u>

504 U.S. at 729.  (emphasis added).

The Court specifically noted that its reversal was limited to the death sentence and did not have any bearing on the validity of petitioner's conviction.  504 U.S. at 739, n. 11.

Neither Crosswhite (juror #23) nor Watkins (juror #119), who petitioner challenged for their bias in favor of the death penalty, actually sat on petitioner's jury because petitioner used his first peremptory strike to strike Crosswhite and his third peremptory to strike Watkins. (Jury list, supplemental record, pp. 135-36).  *Morgan v. Illinois* is therefore inapplicable to petitioner's case.

The state court's decision was not contrary nor did it involve an unreasonable application of Supreme Court precedent.  Further, the decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  (Voir dire testimony: Whitehead, R-578-86; Crosswhite, 788-98; Watkins, 825-31).

Furthermore, in *Ross v. Oklahoma*, 487 U.S. 81, 88-89 (1988), the Supreme Court held that the fact that a defendant was required to use a peremptory challenge to cure a trial court's failure to remove a juror for cause did not violate either the Sixth Amendment right to an impartial jury or the Fourteenth Amendment right to due process.  The court held:

> So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated.

487 U.S. at 88.  See also *Heath v. Jones*, 941 F.2d 1126, 1132-33 (11th Cir. 1991), *cert. denied,* 502 U.S. 1077 (1992).   The Ross court noted:

> Had Huling sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's removal for cause, the sentence would have to be overturned.... But Huling did not sit.   Petitioner exercised a peremptory challenge to remove him, and Huling was thereby removed from the jury as effectively as if the trial court had excused him for cause.

487 U.S. at 85-86.

As previously stated, Crosswhite and Watkins were struck by petitioner's first and third peremptory strikes. In addition, Whitehead (juror #125) was struck by petitioner's second peremptory strike. (Jury strike list, supplemental record, pp. 135-36).

In *United States v. Martinez-Salazar*, 528 U.S. 304 (2000) the United States Supreme Court stated:

> After objecting to the District Court's denial of his for-cause challenge, Martinez-Salazar had the option of letting Gilbert sit on the petit jury and, upon conviction, pursue a Sixth Amendment challenge on appeal. Instead, Martinez-Salazar elected to use a challenge to remove Gilbert because he did not want Gilbert to sit on his jury. This was Martinez-Salazar's choice. The District Court did not demand – and Rule 24(b) did not require – that Martinez-Salazar use a peremptory challenge curatively.

> In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. ... Moreover, the immediate choice Martinez-Salazar confronted – to stand on his objection to the erroneous denial of the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error – comports with the reality of the jury selection process. Challenges for cause and rulings upon them, ... are fast paced, made on the spot and under pressure. Counsel as well as court, in that setting, must be prepared to decide, often between shades of gray, "by the minute." 146 F.3d at 661

528 U.S. at 315-16.

As in *Ross*, 487 U.S. at 91, n. 5, and *Martinez-Salazar*, 528 U.S. at 316, there is no assertion that the trial court in Parker's case deliberately misapplied the law in order to force the petitioner to use a peremptory challenge to correct the court's alleged error. This claim is without merit.

H.   The Claim that the Override of the Jury's Verdict of Life Imprisonment without Parole by the Trial Judge, and the Decision of the Alabama Courts Affirming the Override was a Violation of Petitioner's Rights under the Sixth, Eighth and Fourteenth Amendments.

Petitioner argues that the trial court should have given him the benefit of the mitigating factor of no significant prior history, that the trial court should not have found the aggravating factor of murder for pecuniary gain, that the trial court should not have minimized the effect of the jury's recommendation of life without parole as a mitigating factor and that "judicial override" of a jury verdict is unconstitutional.  This claim was raised on direct appeal.

> 1. Whether the trial court should have given petitioner benefit
> of mitigating factor of no significant prior criminal history

The Alabama Court of Criminal Appeals held that the trial court improperly rejected the mitigating circumstance of § 13A-5-51(1) that "[t]he defendant has no significant history of prior criminal activity" while further finding that the trial court found the existence of two nonstatutory mitigating circumstances – (1) the jury's recommendation of life without parole and (2) petitioner's remorse.  587 So.2d at 1098-99.   The court remanded the case to the trial court for the trial judge to enter specific written findings as to <u>each</u> aggravating circumstance enumerated in § 13-5-49 and <u>each</u> mitigating circumstance enumerated in § 13A-5-51 as required by § 13A-5-47(d)  and to weigh the aggravating and mitigating circumstances and determine if the  aggravating circumstances outweigh the mitigating circumstances and to enter a proper sentencing order pursuant to § 13A-5-47(d). *Id*.

On remand, in the amended sentencing order, the trial court addressed each mitigating factor and each aggravating factor.  In doing so, the trial court found that no significant prior history was a mitigating factor; therefore, this attack on the trial court's action is not properly before this court in this action.

> 2. Whether the trial court should not have found the
> aggravating factor of murder for pecuniary gain

The Alabama Court of Criminal Appeals held that the trial judge properly found the existence of the aggravating circumstance that "[t]he capital offense was committed for pecuniary gain." 587 So.2d at 1098. Petitioner questions the evidence used at trial to support the element of murder for hire as unreliable; however, petitioner was convicted of capital murder for pecuniary gain in violation of § 13A-5-40(a)(7).

In *Haney v. State*, 603 So.2d 368 (Ala. Crim. App. 1991), 603 So.2d 412 (Ala. 1992), *cert. denied*, 507 U.S. 925 (1993), the Alabama Court of Criminal Appeals stated:

> [O]ur capital murder statute contemplates that certain aggravating circumstances will be established by certain capital verdicts. This practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as "double-counting" or "overlap." This practice has been upheld. See *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed. 2d 568 (1988) (upholding Louisiana's capital offense statute in which the intent to kill more than one person is both an element of the capital offense and an aggravating circumstance).
>
> ....
>
> "The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death- eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase."
>
> *Lowenfield v. Phelps*, 484 U.S. at 244-45, 108 S.Ct. at 554. Our statutes that allow double-counting recognize that the jury, by its guilty verdict, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt.

Section 13A-5-45(e) provides, as follows:

> "At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstances which the verdict convicting the defendant establishes was proven

> beyond a reasonable doubt at trial shall be considered as proven
> beyond a reasonable doubt for purposes of the sentence hearing."

Section 13A-5-50 provides, as follows:

> "The fact that a particular capital offense as defined in section 13A-5-
> 40(a) necessarily includes one or more aggravating circumstances as
> specified in section 13A-5-49 shall not be construed to preclude the
> finding and consideration of that relevant circumstance or
> circumstances in determining sentence.
>
> ....
>
> Accordingly, we conclude that the aggravating circumstance that
> "[t]he capital offense was committed for pecuniary gain" was
> established, as a matter of law, by appellant's conviction for the capital
> crime of murder for hire, and the trial court correctly so charged the
> jury.

603 So.2d at 379-80.

The *Lowenfield* case had been decided prior to Parker's trial and subsequent appeal.  The

decision of the Alabama Court of Criminal Appeals in finding that the trial judge's finding that the

capital offense was committed for pecuniary gain was proper was not contrary to and did not involve

an unreasonable application of *Lowenfield* nor was it based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceedings.[7]

> 3.     Whether the trial court should have given weight to the jury's
>        recommendation as a mitigating factor, i.e., whether the "judicial
>        override provision of § 13A-5-47(e) is unconstitutional

---

[7]     As stated at the beginning of this opinion, this case was stayed twice pending decisions by the Supreme Court.
In *Ring v. Arizona*, 536 U.S. 584, 609 (2002), the United States Supreme Court held that the Sixth Amendment
requires a jury, rather than a judge, to find the aggravating circumstance that renders defendant death-eligible.
Subsequently in *Schriro v. Summerlin*, 542 U.S. ____ , 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the Supreme
Court held that *Ring* does not apply retroactively to a death penalty case already final on direct review.
Petitioner's case became final on direct review on June 28, 1993 when the United States Supreme Court denied
the petition for writ of certiorari to the Supreme Court of Alabama.  509 U.S. at 929.  *Ring* and *Schriro* do not,
however, overrule *Lowenfield* because *Ring* and *Schriro* do not involve an aggravating factor that was also an
element of the capital offense.  By convicting Parker of murder for pecuniary gain in violation of 13A-5-
40(a)(7), the jury necessarily found the aggravating factor that the capital offense was committed for pecuniary
gain.

The trial court recognized the jury's recommendation of life without parole as a mitigating factor but explained other factors she considered in addition to the jury's recommendation:

> B.  The court does find that the jury's recommendation is a mitigating factor, and the Court has considered said mitigating factor at this sentence hearing.  However, the Jury was allowed to hear an emotional appeal from the defendant's mother.  Although the defendant's mother attempted to blame the defendant's drug addiction on the medication the defendant had taken as a child for his condition diagnosed as "hyperactivity," there was no proof that such was the case.  Dr. James Crowder testified that a child taking ritalin as prescribed for treatment for hyperactivity would have no withdrawal symptoms from said drug when such drug was discontinued.  The Court does not find that the defendant's problems during his childhood is a mitigating factor.  He was appropriately treated for said condition according to the testimony of Dr. Crowder.

610 So.2d at 1180.

Parker argues that a trial court cannot restrict nor override a jury based upon mitigating facts about the defendant's family history.  Parker's mother's attempt to blame his drug addiction on medication he had taken as a child was based purely on speculation and conjecture and was without any support in other trial testimony.  In other words, proven drug addiction would have been "family history;" however, the unproven cause of the addiction is not "family history."

Parker further argues that "[t]he Alabama capital statute which permits the standardless judicial override of a jury's verdict of Life Imprisonment Without Parole is unconstitutional facially and as applied to John Parker."  The Alabama Court of Criminal Appeals rejected this claim:

> The appellant contends that the trial judge's rejection of the jury's recommendation of life imprisonment without parole and her imposition of the death penalty was unconstitutional and resulted in the arbitrary and standardless imposition of the sentence of death.
>
> The appellant's argument that the jury override provision of the Alabama statutory sentencing scheme, Ala. Code 1975, § 13A-5-47(e), is unconstitutional is without merit.  *Spaziano v. Florida*, 468 U.S.

447, 464-65, 104 S.Ct. 3154, 3164-65, 82 L.Ed.2d 340 (1984). *Frazier v. State*, 562 So.2d 543, 550 (Ala. Cr. App.), reversed on other grounds, 562 So.2d 560 (Ala. 1989), and cases cited therein.

*Tedder v. State*, 322 So.2d 908, 910 (Fla. 1975), requires that in order for a trial judge to reject a jury's recommendation of life without parole, "the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person could differ." The "Tedder standard" is not constitutionally required. *Johnson v. Dugger*, 911 F.2d at 452; *Ex parte Jones*, 456 So.2d 380, 382 (Ala. 1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). The appellant has advanced no reason or argument to convince this court otherwise.

587 So.2d at 1098 (Footnote omitted).

In 1995, in *Harris v. Alabama*, 513 U.S. 504 (1995) the United States Supreme Court upheld Alabama's capital sentencing statute. The Court held that Alabama's sentencing is similar to Florida's sentencing statute that was upheld as constitutional in *Spaziano v. Florida*, 468 U.S. 447(1984). The Court recognized that the statutes differed in that the trial judge in Florida must give "great weight" to the jury's recommendation while the trial judge in Alabama must only "consider" the jury's recommendation. The Court stated:

We have rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentence proceeding is constitutionally required." *Franklin v. Lynaugh*, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988). Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer. See, e.g., *Blystone v. Pennsylvania*, 494 U.S. 299, 306-307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 113-115, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); *Proffitt*, *supra*, 428 U.S. at 257-258, 96 S.Ct., at 2969 (joint opinion of Stewart, Powell, and STEVENS, JJ). To require that "great weight" be given to the jury recommendation here, one of the criteria to be considered by the sentencer, would offend these established principles and place within constitutional ambit micromanagement tasks that properly rest within the State's discretion to administer its criminal justice system. We

> therefore hold that the Eighth Amendment does not require the State
> to define the weight the sentencing judge must accord an advisory
> verdict.

513 U.S. at 512.

The Alabama appellate court decision with respect to the "weight" to be given a jury's recommendation by the trial judge  was not contrary to and did not involve an unreasonable application of *Spaziano* and *Franklin v. Lynaugh,* the precursors of *Harris v. Alabama*.  Further, the decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

I.    Whether the Admission of Petitioner's Statement and Other Evidence were the Result of an <u>Illegal Arrest and a Violation of the Fourth Amendment of the United States Constitution.</u>

This claim was raised and addressed as follows on direct appeal:

> The appellant maintains that his warrantless arrest at his home was illegal because it was without probable cause.  He also argues that because his arrest was illegal, his subsequent statement was inadmissible.
>
> In *Williams v. State*, 565 So.2d 1233, 1236 (Ala. Cr. App. 1990), this Court found that there was probable cause to arrest the appellant's accomplice.  "The information obtained from the anonymous telephone informant and corroborated by the sheriff's department satisfies the totality-of-the circumstances test for determining probable cause set out in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)."  *Williams*, 565 So.2d at 1235.  The facts supplying the probable cause for the arrest of Williams, Smith, and the appellant are virtually identical.
>
> We find that, based on the specific facts presented in this case, the corroboration of the anonymous telephone informant supplied probable cause for this particular appellant's arrest.  See *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).
>
> In determining the legality of the appellant's arrest, this Court need not decide whether the appellant was actually arrested inside his home or whether any warrantless arrest of the appellant at his home constituted

83

a violation of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The statements of the appellant were given to Investigator May at the county courthouse. In *New York v. Harris*, 495 U.S. 14, 21, 110 S.Ct. 1640, 1644-1645, 109 L.Ed.2d 13 (1990), the United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." Therefore, the appellant's statements at the courthouse would have been admissible even if this Court were to accept the appellant's argument that he was arrested without a warrant inside his residence.

587 So.2d at 1088.

Because the Alabama Court of Criminal Appeals relied on the opinion in *Williams v. State*, 565 So.2d 1233 (Ala. Cr. App. 1990), this court must look to the pertinent portion of the opinion in which the appellate court discussed Williams' allegation that his statements were the product of an illegal arrest and concluded that the officers had probable cause to arrest Williams when he was taken into custody.

Mrs. Sennett was murdered on March 18, 1988. Alabama Bureau of Investigation Investigator Harold Carson testified that an anonymous informant supplied information that the defendant, Kenny Smith, and John Parker were involved in the murder of Mrs. Sennett. The informant supplied the names of these individuals, where they lived, and a description of their vehicles. The informant also provided the following information: that the defendant lived in a residence owned by Charles Sennett, the victim's husband; that the three suspects had gone to Coffee High School together and had been close friends; that the murder was originally planned for Wednesday but on that day the victim changed her mind and went to Birmingham with Mr. Sennett, who went to a doctor; that on the day of the murder the defendant purchased a waterbed at Waterworld in Florence with part of the money he was paid to kill Mrs. Sennett; that a Samsung VCR was taken from the Sennett residence and that the informant had seen that VCR at the Smith residence; and that the VCR did not have the remote control unit.

Before the defendant was taken into custody, Investigator Carson corroborated all of this information except the location of the VCR in the Smith residence. The theft of the VCR is significant in

establishing the probable cause to arrest Williams because the fact of the theft had not been made public and the crime scene, the den of the Sennett residence, had been carefully preserved and isolated. This, coupled with the fact that the VCR's remote control unit had not been taken, supports the reasonable inference that the informant was credible and his information reliable. Additionally, Investigator Carson knew that Mr. Sennett, the victim's husband, had given three statements in which he denied any involvement in his wife's murder, that a number of inconsistencies had been discovered in Mr. Sennett's account of the events, that he was a suspect, and that Mr. Sennett had committed suicide on March 25, 1988. Based on the information obtained from the informant, a warrant to search the Smith residence was obtained by Colbert County Sheriff's Investigator Ronnie May early on the afternoon of March 31, 1988.

Later, on that afternoon, a "joint" decision was made by all of the officers involved in the Sennett murder investigation to arrest all three suspects and to execute the search warrant at 3:00 that afternoon. The "team" assigned to take the defendant into custody consisted of Colbert County Sheriff John Aldridge, ABI Investigator Carson, and Florence police officer Glenn Masonia. They went to the defendant's residence in Florence around 3:00 "to take him into custody and ask him to come to be interviewed." The defendant was not at home so Sheriff Aldridge and Investigator Carson returned to the Sheriff's Office in Tuscumbia. Officer Masonia was left to watch the defendant's residence and wait for his return.

Aldridge and Carson returned to the defendant's residence around 5:00 that same afternoon, having "received a call from [the] Florence Police Department that they had made contact with [the defendant] and he was with them." When Aldridge and Carson arrived, the defendant and his girlfriend, Katherine Corbin, were sitting in the defendant's car parked on the street in a location close to the defendant's residence. Officer Masonia was sitting in his police car which was parked behind the defendant's car.

At the suppression hearing, Investigator Carson testified: "We got out of our car. Mr. Williams got out. I asked him for his driver's license for identification.... and we asked him if he would come over, come and sit down in the car with us, we needed to talk to him [about the Sennett murder] and he agreed." Carson also testified that he and the sheriff "both got out of the car and walked up to the side where Mr. Williams was sitting." Carson testified that before the defendant got into Carson's car, Carson "just patted his pockets down to make sure

he didn't have a weapon on him." Once in the car, the defendant was given his *Miranda* rights. Carson "asked if he would accompany us to the courthouse in Tuscumbia and he said, yes and asked could he drive his car and ... we told him we would rather he rode with us and he said let me go tell my girlfriend to follow us over there." Carson stated that he "discouraged" the defendant from driving his own car because "we wanted to make sure that he came over here." The defendant got out of Investigator Carson's car and, without any officer accompanying him, went to his car and had a conversation with his girlfriend and then "voluntarily came back and got in the car."

The defendant was taken to the courthouse. His girlfriend following in the defendant's car. By the time Investigator Carson returned to the courthouse with the defendant, suspects Smith and Parker had already been arrested and had given statements implicating the defendant. Smith's residence had been searched and the VCR taken from the Sennett residence had been discovered.

Carson testified that before he began questioning the defendant at the courthouse, he had been informed of Smith's statement but that he "didn't know anything about what Parker had said."

The information obtained from the anonymous telephone informant and corroborated by the sheriff's department satisfies the totality-of-the-circumstances test for determining probable cause set out in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

. . . .

...[W]e find that there existed probable cause to arrest the defendant when he was initially "taken into custody and asked to come to be interviewed."

Here, the details of the informant's tip as corroborated are sufficient both in number and specificity to establish the informant's credibility. The details of the tip also support the inference that the informant had an adequate basis of knowledge, because those details indicate quite clearly that the informant either had personally observed the facts or had learned them from an actual participant in the crime. See 1 LaFave § 3.3(e) at 671-72.

Much of the information obtained from the informant was of the sort readily available to the public and thus was entitled to little weight in

the probable cause determination.   However, the information concerning the VCR is significant because it indicates that the informant obtained that information in a reliable manner.  The fact that the VCR had been taken during the murder was discovered by the investigating officers only several days after the murder and was a fact known only by them and a few family members.  The additional fact that the VCR in the Smith residence did not have with it a remote control unit and that the remote control unit to the stolen VCR was still in the Sennett residence support the inference that the informant knew what he or she was talking about.  "Although it is clear that an uncorroborated anonymous tip is not sufficient to establish probable cause, nevertheless when, as in this case, the information is sufficiently detailed as to remove suspicion of rumor or revenge; and that information is verified through independent investigation; and the cumulative effect of *all* information gathered meets the standard set forth in [*Gates*], probable cause is established."  *United States v. Rollins*, 699 F.2d 530, 533 (11th Cir.), *cert. denied,* 464 U.S. 933, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).  See also *State v. Calhoun*, 502 So.2d 808, 811 (Ala. 1986).

565 So.2d at 1234-37.  (Emphasis added).

The appellate court decision in Parker's case was not contrary to nor did it involve an unreasonable application of *Illinois v.* Gates, *supra*, and New *York v. Harris, supra*.  Further, the decision was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings involving Parker and Williams, both of whom were charged with the murder of Mrs. Sennett.

J.   The Claim that the Decision of the Trial Court Rejecting
     Petitioner's Request for a Change of Venue Violated the Sixth,
     Eighth and Fourteenth Amendments and Denied Him a Fair Trial.

Parker argues that the denial of his request for change of venue violated the Sixth, Eighth and Fourteenth Amendments and denied him a fair trial.  He alleges that there was widespread news coverage in Colbert County of the death of Mrs. Sennett, the suicide of Mr. Sennett , the arrest and alleged confessions of Williams, Smith, and petitioner, and the trial of Williams. Parker also alleges

that while the court allowed individual voir dire of the jurors who indicated knowledge of the case

from a source other than the news media, the court denied petitioner's request for individual voir dire

of the remaining jurors who indicated that they had knowledge of the case.   He argues that "[t]here

was both actual and presumed prejudice that resulted from the widespread publicity, the prior trial

of a co-defendant and the extensive knowledge and opinions of the venire panel regarding this case."

(Amended petition, p. 149).

On direct appeal, the Alabama Court of Criminal Appeals found that the trial judge did not

abuse her discretion in denying petitioner the unlimited right to question each venire member

separately and individually.   The appellate court relied upon both state and federal law in holding that:

> The trial judge did not abuse her discretion in denying the appellant the unlimited right to question each venire member separately and individually.
>
> > "In *Brown v. State* [571 So.2d 345, 349 (Ala. Cr. App.), cert. quashed, 571 So.2d 353 (Ala. 1990), remanded, 501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 991 (Ala. Cr. App. 1991)], this Court thoroughly examined this issue and recognized that the general rule is that 'the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court.'  However, this Court held that where the defendant demonstrates that the nature of the pretrial publicity raises a significant possibility of prejudice, and a veniremember acknowledges some exposure to that publicity, due process may require individual examination of each veniremember who has been exposed to the pretrial publicity about the extent of their knowledge of the case and may require an independent determination by the trial judge with regard to each veniremember as to whether the member's knowledge had destroyed his or her ability to be fair and impartial.
>
> > *Kuenzel v. State*, 577 So.2d 474, 484 (Ala. Cr. App. 1990), affirmed, 577 So.2d 531 (Ala. 1991).  In *Brown*, this Court held that the trial judge abused his discretion by not permitting individual voir dire

*under the circumstances of that particular case.*  This Court adheres to the principle that even in a death case, "[a]s a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court." *Brown*, 571 So.2d at 349.  See also *Henderson v. State*, 583 So.2d 276 (Ala. Cr. App. 1990); *Kuenzel v. State*, 577 So.2d at 484.  Furthermore, in *Mu'Min v. Virginia,* 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), the United States Supreme Court held that a defendant has no Sixth or Fourteenth Amendment right under the Constitution of the United States to question the prospective jurors about the specific contents of news reports to which they had been exposed.

Following the guidelines this Court set forth in *Brown*, we find that *under the circumstances of this case,* the trial judge did not abuse her discretion in either refusing to permit unlimited individual voir dire of each member of the jury venire or in refusing to permit defense counsel to question the venire members about the specific content of the media reports to which they had been exposed.

First, we find that the pretrial publicity in this case, although quite substantial, was not as extensive or as prejudicial as that presented in *Brown.*  The murder in this case occurred on March 18, 1988. Three people were involved in the commission of that murder--Billy Gray Williams, Kenneth Eugene Smith, and the appellant.  These three individuals were allegedly hired by the victim's husband, Charles Sennett, a minister of the Church of Christ, to kill his wife, Elizabeth Dorlene Sennett.  Mr. Sennett committed suicide on March 25, 1988, seven days after the murder.

In March and April 1988, there was extensive media coverage of the crime.  The coverage continued to a lesser degree in May, June, and August.  Williams was tried in January 1989 and was sentenced in February 1989.  The media also covered the removal of Smith's trial to Jefferson County in March 1989.  The appellant's trial began on May 30, 1989.

Although the crime in this case was horrible, it was not as sensational or lurid as that in *Brown*, which involved the brutal stabbing deaths of a mother and her ten-year-old daughter.  At the time of the crime, Brown was on parole from a conviction of assault of his landlord. That assault had occurred while Brown was on parole from a conviction for having murdered his aunt, his grandmother, and his

89

great-grandmother when he was 14 years old.  See *Brown*, 571 So.2d at 350-51.

Second, in this case, the trial judge *did* allow individual and extensive voir dire of those venire members who indicated that they had formed an opinion about the case or who had a knowledge of the case from some sources other than the media.  However, the trial judge did not allow defense counsel to individually question each member of the venire who merely indicated that they had been exposed to some media report of the crime.

> "THE COURT:  ... I'm not going to grant the request with respect to individual voir dire of everyone who stood up and said they read something about it in the paper.  I am going to grant the request with respect to people who after being asked that stood up and said that they had formed some conclusion about this and I have already granted that on the record.  And if the Defendant wants to follow up with any more general questions and any more possible individual voir dire may arise from that I certainly will go ahead and consider [a] request at that time, but I do not think you have laid the proper predicate for individual voir dire of those people.

R.663-64.

During the third day of jury selection, defense counsel renewed his motion for individual voir dire of every venire member who indicated that they had read or heard any media report of the crime.  The trial judge responded:

"THE COURT:  Let me just say this; I'm going to overrule the motion at this time.  If you do not ask it tomorrow I'm going to ask a general question one more time, if there's anybody who has thought about it because it is obvious that people think about this overnight and then think about something the next morning and I think the question should be asked and if you don't do it or you don't do it I'm going to do it; if there is anybody who has thought about it overnight who thinks they may have a fixed opinion based on--or have an opinion or preconceived notion about this.  I'm going to ask it or you can ask based on anything--for that matter, based on anything that they have read or based on anything that they have heard in court the last four days.  You know, there may be some that think differently just because they've been in court for four days and heard what the

questions are that you have asked them and I think it's an appropriate question to be asked.  I just looked and most of the people who stood up and said they had read something about it in the media have already all been individually voir dired."

R. 885-86.

Finally, we note that the voir dire in this case was quite extensive and thorough, and that the attorneys themselves were permitted to ask their own questions.  The voir dire in this case in no way compares with the almost cursory voir dire in *Brown*.

Our review convinces this Court that the trial judge did not abuse her discretion in denying defense counsel unlimited individual voir dire and in denying defense counsel's request to examine each venire member about the specific contents of any medial report they had read or heard.

"[O]ur own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense.  The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror.  The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire."

*Mu'Min*, 500 U.S. at ___, 111 S.Ct. at 1906.

587 So.2d at 1078-80.

The Court of Criminal Appeals further held:

We also find that the trial judge did not abuse her discretion in denying the appellant's motions for change of venue.

The appellant filed his motion for a change of venue on May 16, 1988.  During the hearing on that motion, it was stipulated that all the evidence, exhibits, testimony, and arguments given in the change

of venue hearing in the case of the appellant's alleged accomplice, Billy Gray Williams, would be admitted into evidence in the appellant's case.  The trial court denied this motion on August 10, 1988.

Following the trial and conviction of Williams on February 24, 1989, the trial judge set a hearing on the issue of venue, although there was no motion for change of venue pending at that time.  The appellant filed an amended motion for change of venue on March 7, 1989.  That motion was heard on March 9, 1989, after a different trial judge had granted a motion for a change of venue in the trial of Kenneth Eugene Smith, another alleged accomplice of the appellant.  It was stipulated that all the exhibits involved in the Smith case would be admitted into evidence in the appellant's case.  The appellant's amended motion for a change of venue was denied on March 21, 1989.

On this appeal, the attorney general admits that there was extensive media coverage of this crime.

"The exhibits submitted in support of John Parker's Motions for Change of Venue reveal intensive, detailed and widespread coverage of the death of Elizabeth Dorlene Sennett, the suicide of Charles Sennett, the arrest and the alleged confessions of Billy Gray Williams, Kenneth Eugene Smith and John Forrest Parker, and the trial of Billy Gray Williams (R. 2203-2421).  These news stories were circulated and broadcast throughout Colbert County, Alabama, by newspapers, radio and television (R.64-84).  These stories covered the details of the alleged crime, and detailed John Parker's alleged involvement in the death of Elizabeth Dorlene Sennett, which implicated John Parker as having confessed to taking Elizabeth Dorlene Sennett's life and implied his guilt during the coverage of the Billy Gray Williams trial.

Appellee's brief at 114-15.

As best this Court can determine, the record indicates that ultimately 65 members of the 93-member venire indicated that they had some prior knowledge of the crime.  Of that 65, 24 members indicated that their knowledge was from a source other than the news media, primarily conversations with other people.  Of those 24, only two members were struck for cause due to their fixed opinions.

The appellant's accomplice Williams was tried approximately three months before the appellant.  In *Williams v. State*, 565 So.2d 1233, 1237-38 (Ala. Cr. App. 1990), this Court found that there was no error in the denial of the motion for change of venue in that case. The trial judge in *Williams* also presided over this case.

"Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned....  In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity....  Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue....   As the Supreme Court explained, in *Irwin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):

> "'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'

> "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved....  Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.'"

*Ex parte Grayson*, 479 So.2d 76, 80 (Ala.), *cert. denied,* 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).

> "An accused is entitled under § 15-2-20 to a change of venue if he can demonstrate that he cannot receive a fair trial in the county where he is to be tried.  It is well established in Alabama, however, that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense....  [J]urors do not have to be totally ignorant of the facts and issues involved in a particular case in order to reach an unbiased verdict....  To satisfy her burden of proof in the present case, [the defendant] had to establish

that prejudicial pretrial publicity has so saturated Lamar County as to have a probable prejudicial impact on the prospective jurors there, thus rendering the trial setting inherently suspect.  This required a showing that a feeling of deep and bitter prejudice exists in Lamar County as a result of the publicity....

"Whether to change venue is discretionary with the trial judge....  In determining whether there has been an abuse of that discretion, an appellate court reviews the trial judge's order de novo, without any presumption in favor of that order....

"... In *Primm v. State*, 472 So.2d 1149, 1155 (Ala. Crim. App. 1985), the court, quoting *Anderson v. State*, 362 So.2d 1296, 1299-1300 (Ala. Crim. App. 1978), correctly stated:

"'Generally newspaper articles which objectively report the commission of a crime, do not carry inflammatory headlines, and do not editorialize on the facts in a manner to inflame the community or create an atmosphere of prejudice are an insufficient basis on which to grant a motion for a change of venue.  *Gray v. state*, 56 Ala. App. 131, 319 So.2d 750 (1975).'"

In *Mathis v. State*, [280 Ala. 16, 189 So.2d 564 (1966), *cert. denied*, 386 U.S. 935, 87 S.Ct. 963, 17 L.Ed.2d 807 (1967)], the following is stated:

"'"In *Godau v. State*, 179 Ala. 27, 60 So. 908, 910 [1913], it was said:

"'""So long as we have newspapers we may expect to have through them the report of crimes, and it is not to be unexpected that, when a homicide is committed ... the newspapers of the community, answering the public interest, will furnish the defendant with at least some material upon which to base an application similar to the one under discussion.'

"'"Also in *McClain v. State*, 182 Ala. 67, 62 So. 241, 243 [1913], it was said:

"""We are not prepared to concede ... that the sensational language of a newspaper reporter or special correspondent used in "writing up" such cases ... may be safely taken as a reflection of general public sentiment; nor that it may be lightly assumed that such statements as those ... shown are capable of permanently molding and fixing the opinions of the more intelligent classes of the people to the extinction of their sense of fair play, and the suppression of their sober second thought.'

"""The mere belief of the defendant or of his witnesses that he cannot receive an impartial trial is not sufficient to entitle him to a change of venue....'"

280 Ala. at 18, 189 So.2d at 566 (quoting *Campbell v. State*, 257 Ala. 322, 324-25, 58 So.2d 623 (1952)."

*Ex parte Fowler*, 574 So.2d 745, 747-48 (Ala. 1990).

Applying the principles of *Grayson* and *Fowler* to this particular case, we find that the trial judge did not abuse her discretion in denying the appellant's motions for change of venue.

587 So.2d at 1080-81.

In *Irwin v. Dowd*, *supra,* the court found actual prejudice where 8 of the 12 jurors had an opinion that the petitioner was guilty.  In *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) the court presumed prejudice where the pretrial publicity was sufficiently prejudicial and inflammatory and the pretrial publicity saturated the community where the trial was held.   Petitioner argues that he has shown both actual and presumed prejudice.  The state appellate court concluded in effect that petitioner had not shown presumed prejudice based upon the pretrial publicity.

This court has reviewed the news articles contained in the record.  (Supplemental record). The news articles relied upon by petitioner were "essentially factual and [were] not directed at arousing or inciting the passion of the community."  *Devier v. Zant*, 3 F.3d 1445, 1462 (11th Cir.

1993), *cert. denied*, 513 U.S. 1161 (1995). Many of the articles focused on the investigation of the crime before there were any suspects. While some of the articles or reports indicated that the victim had been stabbed repeatedly and beaten, the reports recounted this in a factual rather than sensational manner. No photographs of the crime scene accompanied the newspaper articles. There were no articles or editorials that discussed or dwelt on the nature of the murder and the appropriate punishment.

In general, the news articles report that the victim's husband, who was a minister, committed suicide when he was told that he was suspect in her death, that authorities believed the minister had hired three men to kill his wife with $3,000 that he had borrowed from the woman with whom he was having an affair, and that petitioner, Williams and Smith, had been charged with capital murder.

The prospective jurors as a group were questioned several times concerning whether they would be able to set aside prior knowledge of the case based on something they had read, heard, or seen and base their decision solely on the testimony and evidence presented at trial. (R. 394-402, 898-900). Of the venire members with prior knowledge of the crime, 17 members indicated that their knowledge was from a source other than the news media. (R-399-401; Amended petition, p. 147). Those 17 members were questioned in detail concerning their ability to set aside prior knowledge and base their decision solely on the testimony and evidence presented at trial. Of those 17, three were struck from the venire due to their fixed opinions. (R-546, R-566, R-596). A fourth member of the venire who had knowledge from the news media was subsequently struck from the venire based upon her fixed opinion which became evident based on voir dire examination

concerning her views on the death penalty and whether she could consider life without parole and mitigating circumstances.  (R-877-78).

With respect to whether petitioner can show actual or presumed prejudice based on the pretrial publicity, this court would add some facts that are relevant.  Eight of the 14 jurors seated for the case  (R-904) had knowledge about the case from the news media (James Ayers, R-395; Joni Simpson, R-397; Roy Mitchell, R-398; Glenn Pettus, R-399; Gary Highfield, R-399; Jerry Hutchens, R-399; and Teddy Mansell, R-399).   Three of the eight seated jurors with prior knowledge also had knowledge from sources other than the media (James Ayers, R-400; Teddy Mansell, R-401; Gary Highfield, R-401).  In response to questioning by the prosecutor or defense counsel, all eight of the jurors with prior knowledge indicated by their silence that they could set aside that prior knowledge and decide the case based solely on the evidence and the testimony heard in the courtroom.  (R-401-02; 899-900).  In addition, the three jurors who were questioned on individual voir dire both explained the prior knowledge they possessed and indicated affirmatively that they could set aside that prior knowledge and decide the case based solely on the evidence and testimony in the courtroom.  (R-491-97, 550-53, 596-604).

The decision of the Alabama Court of Criminal Appeals was not contrary to nor did it involve an unreasonable application of *Mu'Min* and *Irwin v. Dowd*.  Further, the decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

K.     The Claim that the Refusal to Grant Petitioner's Motion for Recusal of the Trial
        Judge Denied Him His Rights Under the Sixth, Eighth, and Fourteenth Amendments.

Petitioner filed a Motion for Recusal requesting that Judge Johnson recuse herself from the case based upon her order in CC88-107, *State of Alabama v. Billy Gray Williams* in which she made findings of fact that Williams hired petitioner and Smith to kill Mrs. Sennett, that petitioner and Smith killed Mrs. Sennett, and that petitioner and Smith were paid for killing Mrs. Sennett. Petitioner argues that by imposing a sentence of life imprisonment without parole upon Williams, Judge Johnson indicated a bias and predisposition toward the guilt of petitioner prior to any evidence being heard in his trial and further indicated a bias or predisposition toward a sentence of death for petitioner if convicted of a capital offense.

The Alabama Court of Criminal Appeals addressed this issue on direct appeal in the following manner:

> The appellant argues that the trial judge should have granted his motion to recuse because that judge, in sentencing Billy Gray Williams to life imprisonment without parole, had determined that Williams had hired the appellant and Smith to murder Mrs. Sennett, that the appellant and Smith had actually murdered Mrs. Sennett, and that the appellant and Smith had been paid for the contract killing. The appellant argues that the trial judge was biased and prejudiced and had prejudged his case because she had been the judge in the trial of the appellant's alleged accomplice Williams, who was tried and convicted prior to the appellant's trial.
>
> We hold that the trial judge who presided over the appellant's trial for capital murder was not disqualified because that same judge had previously presided over the trial of the appellant's alleged accomplice in the commission of the same murder for hire.
>
> "To disqualify a judge for bias, the bias must be shown to be personal." *Ex parte Whisenhant*, 555 So.2d 235, 238 (Ala. 1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).
>
> > "[T]he fact that the trial judge had presided over the defendant's previous two sentencing trials was not grounds for disqualification. A trial judge need not recuse himself

98

> solely on the ground that he was the 'same trial judge who had heard the case and imposed the death penalty' in a defendant's prior trial.  *Ex parte Whisenhant*, 482 So.2d 1241, 1245 (Ala. 1983).

*Whisenhant*, 555 So.2d at 238.

> "Ordinarily, a judge's rulings in the same or a related case may not serve as the basis for a recusal motion.  *Jaffe v. Grant*, 793 F.2d 1182, 1189 (11th Cir. 1986), *cert. denied,* 480 U.S. 931, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987).  The judge's bias must be personal and extrajudicial; it must derive from something other than that which the judge learned by participating in the case.  *Id*. at 1188-1189.  An exception to this general rule occurs when the movant demonstrates 'pervasive bias and prejudice.'  *Id*. at 1189 (quoting *United States v. Phillips*, 664 F.2d 971, 1002-03 (5th Cir., Unit B (1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982))."

> *McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990).  In this case, the appellant has made no showing of pervasive bias and prejudice and this Court has found no indication that such was present.  Our independent review of the record convinces this court that the trial judge was fair and impartial.

587 So.2d at 1097-98.

Petitioner argues that the decisions of the Alabama courts were contrary to, or involved an unreasonable application of clearly established federal law, and/or were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Petitioner relies upon *Liteky v. United States*, 510 U.S. 540, 555 (1994) to support his argument that "[w]here a trial judge has formed opinions, even from a judicial source such as a trial of a codefendant if they 'reveal such a high degree of favoritism or antagonism as to make fair judgment impossible,' due process requires recusal of the judge from the case."

99

In *Liteky*, the Supreme Court in interpreting 28 U.S.C. § 455(a), a federal statute dealing with disqualification of a judge, explained:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. ... Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

510 U.S. at 555.

The *Liteky* Court held that the judge's conduct "occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." 510 U.S. at 556.

The only references to petitioner in the Order of Court on Imposition of the Sentence of Life Imprisonment without Parole in CC88-107 *State of Alabama v. Billy Gray Williams* are found in the following pertinent portion of the findings of fact:

> The Court finds from the evidence introduced at trial that the defendant, Billy Gray Williams, at that time twenty one (21) years old, in early March, 1988, for the sum of One Thousand and no/100 ($1,000.00) Dollars agreed with Charles Sennett, the husband of the victim, to hire Kenneth Eugene Smith and through said Smith, *John Forrest Parker* to kill Elizabeth Dorlene Sennett. That Defendant, Billy Gray Williams, did kill Elizabeth Dorlene Sennett, and with the intent that Elizabeth Dorlene Sennett be killed agreed with said Kenneth Eugene Smith and *John Forrest Parker* that they would be paid for said killing. That Kenneth Eugene Smith and *John Forrest*

*Parker* did kill Elizabeth Dorlene Sennett on March 18, 1988 and Defendant, Billy Gray Williams, was paid One Thousand and no/100 ($1,000.00) Dollars that day by Charles Sennett, and Kenneth Eugene Smith and *John Forrest Parker* were paid the balance of the total sum of Three Thousand and no/100 ($3,000.00) Dollars for said contract killing, namely Two Thousand and no/100 ($2,000.00) Dollars.

The Court considers the aggravating circumstances as set out and enumerated in Section 13A-5-49 of the Code of Alabama of 1975, as amended.

A.   The Court finds from the evidence introduced at the punishment hearing before the jury that the defendant, Billy Gray Williams, committed this murder for pecuniary gain, for money. That he and Kenneth Eugene Smith and *John Forrest Parker* were in fact all paid for committing the intentional killing of Elizabeth Dorlene Sennett.   The Court finds that this is an aggravating circumstance pursuant to Section 13A-5-49(6) of the Code of Alabama of 1975, as amended.

R. 2049-50.

In denying the motion to recuse, the trial judge explained her findings concerning Parker in the

*Williams* case:

[T]here seems to be confusion about the question of the Court's sentence hearing and sentence order in the Billy Gray Williams' case, which was CC88-107, which has been tried and disposed of.  Under Section 13A-5-47 the trial court is ordered and mandated by law to make a written finding of facts in capital cases.  That's what I did in that case, that is in the Billy Gray Williams' case.  That is based on a findings of facts from the evidence introduced at the hearing in that case.  That has nothing to do with this case. ... [T]here has not been one sentence of evidence in this case, State of Alabama versus John Forrest Parker presented at this time.  The order of the court on imposition of sentence of life imprisonment without parole was an order and is an order that was summarized in the findings of facts based on the evidence heard in the Billy Gray Williams' case as mandated by the Code of Alabama.  It in no way reflects on this Court's opinion which this Court doesn't have an opinion about anything in this case at this time. ... [T]he order as it appears in the

101

> case of; [sic] State of Alabama versus Billy Gray Williams, which
> was my findings of fact mandated by the Code of Alabama is based
> on the facts in that case and that case only. ...  I'm going to deny the
> Motion for Recusal.

(R.59-62).

The appellate court decision was not contrary to nor did it involve an unreasonable

application of Supreme Court precedent.  Further, it was not based on an unreasonable

determination of the facts in light of the evidence presented in state court proceedings.

L.     The Claim that the Admission of Testimony Concerning Mr. Parker's Alleged
       Statement, Extracted from Mr. Parker While his Judgment was Impaired and
       Without a Valid Waiver of His Rights to Remain Silent and to Have Counsel
       Present with Him During Interrogation Violated His Rights Under the Fifth,
       <u>Sixth and Fourteenth Amendments to the United States Constitution</u>

Petitioner argues:

> The evidence presented at John Parker's suppression hearing revealed
> that he had consumed at least 6 to 8 beers and 5 to 8 more marijuana
> joints from sometime prior to noon until approximately 3:30 p.m.
> (RT. Vol. 2, 237-239).  Dr. James Edward Crowder testified that
> John Parker had an I.Q. of 78 which was in the border line range of
> intellectual ability, just above mental retardation.  (RT. Vol. 2, 255).
> He further testified that if John Parker had consumed the amount of
> beer and marijuana, previously testified to, that in his opinion,
> then his judgment would be impaired to some extent.  (RT. Vol. 2, 259-
> 260).   John Parker's impaired state rendered him incapable of
> executing an intelligent waiver of a know[n] Constitutional right as
> his [sic] required under *Johnson v. Zerbst*, 304 U.S. 458 (1938) and
> its progeny.   Any statement obtained from Mr. Parker in this
> custodial setting deprived Mr. Parker of his rights to be free from
> compulsory self-incrimination and his right to have counsel present
> during questioning in violation of the Fifth, Sixth and Fourteenth
> Amendments to the United States Constitution.  The Alabama courts
> erred in upholding the admission of the unlawfully obtained
> statement.

(Amended petition, p. 152).

On direct appeal, the Alabama Court of Criminal Appeals held:

> The appellant argues that his statement was involuntary because he
> was under the influence of marijuana and alcohol at the time the
> statement was given and because he had an IQ of 78, which is just
> above mental retardation.  Appellant's brief at 82-83.

> However, just as there was evidence that the appellant's judgment
> was impaired, there was contradictory evidence that the appellant
> knowingly, voluntarily, intelligently, and repeatedly waived his rights
> under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d
> 694 (1966).  In addition, the State's evidence is that the appellant

103

requested to speak to Investigator Ray and thereby initiated the taking of his statements.

We have reviewed the testimony adduced both at the hearing on the motion to suppress and at trial.  In *Williams v. State*, 461 So.2d 834, 838 (Ala. Cr. App. 1983), reversed on other grounds, 461 So.2d 852 (Ala. 1984), this Court collected the principles of appellate review of a trial judge's determination of the admissibility of a confession or statement based on conflicting evidence of voluntariness.  Applying those principles to the facts of this case, we find no error in the admission of the appellant's statement.  "Before a confession is admissible, the trial judge must be satisfied by a preponderance of the evidence that it was voluntarily made....  This finding will not be disturbed on appeal unless it is evident that the determination was palpably contrary to the weight of the evidence." *Ex parte Singleton*, 465 So.2d 443, 445 (Ala. 1985).  See also *Jackson v. State*, 562 So.2d 1373, 1380 (Ala. Cr. App. 1990).

(R-56, 587 So.2d at 1088-89)

In reply, petitioner states:

As set out in detail in the Amended Petition the decisions of the Alabama courts were contrary to, or involved an unreasonable application of clearly established federal law, and/or were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Parker maintains that his impaired state rendered him incapable of executing a valid waiver of his

*Miranda* rights.  In *Johnson v. Zerbst*, 304 U.S.  458 (1938), the Supreme Court held:

A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.  The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

In the *Johnson* case, the petitioner was tried, convicted and sentenced without the assistance of

counsel.

In *Townsend v. Sain*, 372 U.S. 293, 308 (1963), the Supreme Court reiterated that "[i]f an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced."  The *Townsend* case, unlike the case here, involved that administration of drugs (phenobarbital to ease withdrawal and scopolamine allegedly used as a "truth serum") by a police physician.  There is no allegation in this case that drugs were administered to Parker while in police custody.

Neither *Johnson* nor *Townsend* was factually similar to Parker's case.  Moreover, Parker has not identified a factually similar United States Supreme Court case.  The decision of the Alabama Court of Criminal Appeals was not contrary to a factually similar United States Supreme Court decision nor did it involve an unreasonable application of United States Supreme Court law.

Finally, the decision was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  At the suppression hearing, Investigator Ronnie May testified that after Parker arrived at the sheriff's office and was advised of his rights by Investigator Hargett, that Parker asked to speak to him [May], that May advised Parker again of his *Miranda* rights, that petitioner stated he understood those rights and still wished to speak to May. Petitioner did not want May to tape record the conversation or make notes, that petitioner then proceeded to tell him the details of events before, during and after the crime.  (R-140-48).  May testified that he did not appear under the influence of drugs or alcohol and appeared to know and understand what he was saying.  (R-150-51).  Petitioner specifically denied having "shot up any Talwin" that day prior to talking to May.  (R-155).

Investigator Doug Hargett of the Colbert County Sheriff's Office testified at the suppression hearing that he advised petitioner of his *Miranda* rights both at the apartment and at the Colbert

County Courthouse, that he explained those rights and asked if petitioner understood them and that petitioner verbally acknowledged that he understood and also signed a waiver. (R-203-04). Investigator Hargett also testified that he had experience and training in determining whether a person appeared to be under the influence of alcohol or drugs, that petitioner did not appear to be under the influence of alcohol or drugs. (R-209-210). Angela Fountain, petitioner's girlfriend, testified that petitioner's drinking was a daily habit, that in some ways petitioner appeared under the influence at the courthouse, "but in other ways he was upset," that petitioner could handle his alcohol "on certain occasions." (R-238-39, 249). Dr. James Edward Crowder, clinical psychologist, testified that, in his opinion, based upon 6-8 beers and 5-6 marijuana cigarettes, petitioner "would have had a reduction in his ability to withstand pressure. He would have had a reduction in his ability to withstand frustration and that he would have had to some extent an impairment in his judgment." (R-259-60). Dr. Crowder further testified that a person sometimes develops a tolerance to alcohol and can function at higher levels of alcohol due to the fact that they are experienced drinkers. (R-262).

M.    The Claim that the Failure to Instruct on Lesser Included Offenses Which were Supported by the Evidence Presented at Trial Denied Mr. Parker Due Process and a Reliable Sentencing Procedure in Violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

In *Beck v. Alabama*, 447 U.S. 625 (1980), the United States Supreme Court found an Alabama statute that prohibited lesser included offense instructions in capital cases to be unconstitutional when lesser included offenses existed under state law and such instruction were generally given in noncapital cases. In *Hopkins v. Reeves*, 524 U.S. 88 (1998), the United States Supreme Court held that a state trial court is not required to instruct a jury on lesser included

offenses of the charged offense  if these offense would not be lesser included offenses under state law.

Petitioner argues that the trial court should have given a jury instruction on intentional murder because the jury could have found that the state did not meet its burden on proving the issue of pecuniary gain.  He further argues that the trial court failed to instruct the jury on reckless murder because the jury could have found that petitioner did not possess a particularized intent to kill as evidence by the theory that petitioner and a co-defendant assaulted the victim but that the victim's husband then killed her.

On direct appeal, the Alabama Court of Criminal Appeals held:

> The trial judge properly refused to instruct the jury on murder as a lesser included offense of capital murder for hire because there was no rational basis for such an instruction. See Ala. Code 1975, § 13A-5-41.
>
> The trial judge instructed the jury on the charged offense of capital murder for hire and on the lesser included offenses of conspiracy to commit murder, assault in the first and second degree, and manslaughter.  At trial, the appellant did not object to the trial judge's oral charge.
>
> The State's evidence shows that the appellant participated in the murder of Mrs. Sennetts and that he received financial compensation for his actions.
>
> The appellant's defense was that he did participate in an assault on Mrs. Sennetts but that he left her alive and that she was stabbed to death by Mr. Sennetts after the assault had occurred.  In his closing argument, defense counsel argued that there was "no question" that the appellant was guilty of assault and conspiracy to commit assault, but that the appellant was not guilty of murder.
>
> Here, neither the evidence presented by the prosecution nor that presented by the defense provides a rational basis for a verdict of murder.  Following the principle collected in *Holladay v. State*, 549

So.2d 122, 128-29 (Ala. Cr. App. 1988), affirmed, 549 So.2d 135 (Ala.), *cert. denied,* 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989), we find that the trial judge properly refused to instruct the jury on intentional murder as a lesser included offense of the crime charged.  See also *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

Under any view of the evidence, there is no basis for an instruction on reckless murder as defined by Ala. Code 1975, § 13A-6-2(a)(2), because the appellant's actions were directed solely at the victim and therefore did not "manifest[ ] extreme indifference to human life." *Northington v. State*, 413 So.2d 1169 (Ala. Cr. App. 1981), *cert. quashed*, 413 So.2d 1172 (Ala. 1982).

(R-56, 587 So.2d at 1083-84).

Petitioner argues the decisions of the Alabama courts were contrary to, or involved an unreasonable application of clearly established federal law, and/or were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   The Alabama Court of Criminal Appeals referred to *Schad v. Arizona*, 501 U.S. 624 (1991) wherein the United States Supreme Court rejected the petitioner's contention that due process principles underlying *Beck* require the jury in a capital case be instructed on every lesser included noncapital offense supported by the evidence.  The court in *Schad* stated:

Our fundamental  concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.  ....

We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented.   [citation omitted].  As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984), "[t]he absence of a lesser included offense instruction increases the risk that the jury will convict ... simply to avoid setting the defendant free....  The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding

> process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." See also *Hopper v. Evans*, 456 U.S. 605, 609, 102 S.Ct. 2049, 2051-2052, 72 L.Ed.2d 367 (1982).

501 U.S. at 646-47.

The decision of the Alabama Court of Criminal Appeals was neither contrary to nor an unreasonable application of either *Beck* nor *Schad*. Further, it was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, specifically the testimony that Parker was paid $1,000.00 and Parker's theory of defense that he and Smith assaulted the victim and her husband then killed her.

N.   Whether Trial Court's Testimony Regarding its Personal Recollections Deprived Petitioner of his Sixth and Fourteenth Amendment Rights to Confrontation and Whether Alabama's System of Allowing Judges to Review Their Own Court's Errors in the Rule 32 Process is Inherently Unconstitutional and a Violation of the Sixth, Eighth and Fourteenth Amendments

Petitioner argues that in the order denying the Rule 32 petition, the trial judge in several instances acted as a witness by relying on her recollection of events prior to and at trial and in so doing deprived him of his right to confrontation.

Respondents argue that this claim is procedurally barred from federal review because it was raised for the first time on appeal from the denial of the Rule 32 petition. *Oats v. Singletary*, 141 F.3d 1018, 1027 n.24 (11th Cir. 1998). In *Harris v. Reed*, 489 U.S. 255 (1989), *remand*, 894 F.2d 871 (7th Cir. 1990) the Supreme Court held that a "procedural default does not bar consideration of a federal claim on ... habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." The Alabama Court of Criminal Appeals clearly and expressly held on appeal from the denial of the Rule 32 petition:

> A review of the record reveals that the appellant's claims have been raised for the first time in his appellate brief to this court. This court will not consider an argument that is raised for the first time on appeal; its review is limited to evidence and arguments that have been considered by the trial court. *Eastland v. State*, 677 So.2d 1275 (Ala. Cr. App. 1996).

(R-61).

"When a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice." *See Wilson v. Jones*, 902 F.2d 923, 925 (11th Cir. 1990), *reh. denied*, 927 F.2d 615 (11th Cir. 1991), *citing Bennett v. Fortner*, 863 F.2d 804, 806 (11th Cir.), *cert. denied*, 490 U.S. 1071 (1989); *see also Engle v. Isaac*, 456 U.S. 107, 129 (1982).   Petitioner makes no attempt to show cause for his procedural default and prejudice resulting therefrom.[8]

O.     Whether Petitioner was Denied Due Process and a Fair Hearing on Remand for Resentencing when the Trial Judge Conducted No Additional Hearing (Other than the *Batson* Issue) and Gave Petitioner No Opportunity to Present Evidence or Argument, or Allow Petitioner to Speak on his Own Behalf

---

[8]     Moreover, this claim does not state a basis for federal habeas relief.

28 U.S.C. § 2254(a) provides:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court **only on the ground that he is in custody in violation of the Constitution** or laws or treaties of the United States.

(Emphasis added.)

In this claim, petitioner attacks not his conviction but the collateral review process. "While habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief." *Quince v. Crosby*, 360 F.3d 1259,1262 (11th Cir. 2004), *cert. denied*, 125 S.Ct. 436 (2004); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987).

Petitioner argues he was denied due process and a fair hearing on remand because he was not given an opportunity to present argument and evidence before findings of fact were made by the judge.  In effect, he appears to argue that he was entitled to a new sentencing hearing comporting with § 13A-5-47  based on the remand.

Respondents argue that this claim has not been raised at any time in state court and is therefore procedurally defaulted.  In Teague *v. Lane*, 489 U.S. 288 (1989), *reh. denied*, 490 U.S. 1031 (1989), the Supreme Court held that the procedural default rule applies where a claim has never been presented to the state courts.  This claim was, in fact,  never presented in state court and is therefore procedurally barred from federal review.

Parker has made no showing of cause for his procedural default nor prejudice resulting therefrom.   In his reply brief Parker ignores the procedural default argument of respondent altogether and argues that the decisions of the Alabama courts were contrary to, or involved an unreasonable application of clearly established federal law or were based on an unreasonable determination of the facts.  Because this claim was not previously raised in state court, there were no decisions of Alabama courts that could be contrary to or involve an unreasonable application of clearly established federal law or that could be based on an unreasonable determination of facts based on evidence in state court proceedings.

Furthermore, the appellate decision clearly contemplated a new sentencing order in compliance with 13A-5-47(d) but not necessarily a new sentencing hearing.  The trial judge had the transcripts from the original sentencing hearing before the jury (R.1673-1784) (consisting of witnesses & arguments) and the judge (R.1808-19) (consisting only of argument) and could refer

to the transcripts when correcting the defects in the sentencing order as identified by the appellate

court.

P.      Whether Petitioner's Arrest was Illegal in that Colbert County Police
        Officers Lacked Jurisdiction for the Arrest of Petitioner and Any Subsequent
        Statements were the Result of that Illegal Arrest.  (see also argument I)

        In support of this claim, petitioner argues in the amended petition that he was arrested at his

home on Huntsville Road by Colbert County investigator Doug Hargett and that his residence was

not in Colbert County; therefore, his arrest was illegal and any statements obtained from that arrest

should have been suppressed.

        Respondents argue that this claim was not raised in state court and is, therefore, procedurally

defaulted from federal review. [9]  Although petitioner made a passing reference to Issue I when

presenting this claim in the amended habeas petition, he has not identified where in state court he

presented a separate claim based on the alleged extrajurisdictional warrantless arrest.   Further, the

court has studied Issue I of the federal petition, issues VII and VIII raised on direct appeal (Tab #R-

---

[9]     In *Ward v. State of Texas*, 316 U.S. 547, 552 (1942), the United States Supreme Court held "The sheriff of
        Morris County had no power to arrest petitioner in Titus county.  Without the boundaries of Morris County he
        had no more authority than any private citizen."  In *Hill v. State*, 665 So.2d 1024 (Ala. Crim. App. 1995), the
        Alabama Court of Criminal Appeals was faced with the question of  "whether a deputy can make a warrantless
        arrest outside the deputy's jurisdiction."  The court adopted the prevailing view that "if the circumstances were
        such that a private citizen would have had the authority to make a citizen's arrest under the same circumstances,
        then the extrajurisdictional warrantless arrest is legal."  § 15-10-7 reads in pertinent part:

        (a)     A private person may arrest another for any public offense:
                (1)  Committed in his presence;
                (2)  Where a felony has been committed, though not in his presence, by the person arrested;
                     or
                **(3)  Where a felony has been committed and he has reasonable cause to believe that the
                       person arrested committed it.**  (Emphasis added).

        In Issue I, this court concluded that the appellate court's holding that officers had probable cause to arrest
        Parker was not contrary to and did not involve an unreasonable application of federal law nor was the decision
        based on an unreasonable determination of the facts in light of the evidence in the sate court proceedings.  Thus,
        if this court were to address the merits of this claim, the court would find the claim to be without merit.

30), and claim I(B) on appeal from the denial of the Rule 32 petition.  (Tab #R-49).  Petitioner did

not refer to the fact that his residence was not in Colbert County but that he was arrested by a

Colbert County officer at that residence anywhere (either as a substantive claim or as part of an

ineffective assistance of counsel claim) other than in this Issue P where it is raised for the first time

on federal review.

This claim is therefore procedurally barred from federal review under *Teague*, *supra*.

Further, there has been no showing by petitioner of cause for the procedural default nor prejudice

resulting therefrom.  Because this claim was not previously raised in state court, there were no

decisions of Alabama courts that could be contrary to or involve an unreasonable application of

clearly established federal laws or that were based on an unreasonable determination of facts based

on evidence in state court proceedings.

Q.     The Claim that Parker's Statements were the Result of Illegal and Unconstitutional Duress

In the amended federal habeas petition, petitioner alleged that he was told by the police that

if he did not cooperate and make a statement his girlfriend would have her child removed from her

custody.  Respondents acknowledge that this claim was raised for the first time in the Rule 32

petition and argues that the claim is therefore procedurally defaulted.  In the Rule 32 petition (Claim

II.D.) petitioner argued that his statements were involuntary due to a combination of factors

including low intelligence and educational level, intoxication, and police coercion.  In the Rule 32

petition, petitioner alleged in pertinent part:

> 5.     Involuntariness is also evident based on police coercion. The
> State did not contest that Ms. Fountain was threatened with
> the loss of custody of her child if she did not cooperate with
> the police. (R. 236).  The threat was communicated to Mr.
> Parker.

> 6. The police also placed Ms. Fountain in a room with Mr. Parker for the purpose of telling him that co-defendants were incriminating him, which was untrue. (R. 236-237). Within minutes of Ms. Fountain's communication, Mr. Parker is alleged to have asked to speak to Investigator May and to have recanted his prior written statement which denied participation in the crime.

(Tab #R-43, p.17.)

In the order denying the Rule 32 petition, Judge Johnson stated:

> [A] reading of the suppression hearing testimony reveals that the petitioner initiated the conversations with Investigator May (R. 139-140); was read his *Miranda* rights at least twice before making a statement (R. 142-143); had the presence of mind to ask Investigator May not to write anything down or to tape record the conversation (R. 144); and was able to go into great detail concerning the events surrounding the murder in this case (R. 146-148). The next day, after being advised of his *Miranda* rights yet again, the petitioner made further statement regarding property taken from the Sennett's home (R. 151) and the destruction of the clothing he wore while committing this crime (R. 152). Petitioner appeared to be coherent. (R. 152. This chain of events show the working of a competent, rational mind and not any form of police coercion (petition II.D and II.E). If police coercion was present, petitioner failed to adduce any evidence of it at the Rule 32 hearing.
>
> In determining whether a confession is voluntary, the trial court's finding on voluntariness need only be supported by a preponderance of the evidence. *Seawright v. State*, 479 So.2d 1362, 1367 (Ala. Cr.App. 1985) .... "The test for the voluntary nature of an extrajudicial confession or inculpatory statement is whether in light of all the surrounding circumstances, the statement was free from inducement, threat or promise, either expressed or implied, which would have produced in the mind of the accused any fear of harm or hope of favor." *Seawright*, 479 So.2d at 1367, *citing Rogers v. State,* 365 So.2d 322 (Ala. Cr. App.), *cert. denied*, 365 So.2d 334 (Ala. 1978).

*Harris v. State*, 1997 W.L. 187105 (Ala. Cr. App.)  (Tab #R-60, pp. 12-13).

On appeal from the denial of the Rule 32 petition, this claim was not raised as an independent claim but, rather, as part of the claim that trial counsel failed to demonstrate that there were insufficient intervening events to break the causal relationship between Mr. Parker's arrest and his statement. (R-49, pp. 21-24).  Because this claim was not raised as in independent claim on appeal from the denial of the Rule 32 petition, this claim is procedurally barred from federal review.

In *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) because of the petitioner's failure to fairly present claims to the state courts, his habeas claims were unexhausted but they were also procedurally defaulted because the state remedy was no longer available.  That is likewise the case here, and there has been no showing of cause and prejudice to excuse the procedural default.

Because of the procedural default, this court will not look back to the ruling on the Rule 32 petition to determine whether it was contrary to or involved an unreasonable application of federal law nor whether it was based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

R.     Whether the Claim that the Grand Jury which Issued Parker's Indictment
       was Selected in a Discriminatory and Unconstitutional Manner

Petitioner alleges in the amended federal habeas petition that "[t]he racially discriminatory selection of the grand jury tainted John Parker's capital proceedings from the very beginning and violated his rights to equal protection, due process, a fair trial, an impartial jury, and a fair cross-section protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  This claim was raised as Claim P in the amended Rule 32 petition (Tab #R-43, p. 342).  In the order denying the Rule 32 petition, Judge Johnson stated:

>        5.     The petitioner claims he was denied his rights to grand and
>               traverse jury pools chosen from a fair cross section of the

115

community (petition II.P.).  This Court notes that this claim is being raised for the first time in the Rule 32 petition.  This Court also notes that no evidence of this claim was presented at the Rule 32 hearing.  However, the method of jury pool selection in the State of Alabama has been repeatedly upheld.  In *Cothren v. State*, the Court stated that, "the jury venire was randomly drawn selected from a list of licensed drivers in Shelby County.  This Court has repeatedly upheld this method of random selection against constitutional challenges.  *Cothren v. State*, 1997 WL 15337 (Ala. Cr. App.) at p. 9; see also *Dobyne v. State*, 672 So.2d 1319 (Ala. Cr. App.), *on remand*, 672 So.2d 1353 (Ala. Cr. App. 1994), aff'd, 672 So.2d 1354 (Ala. 1995), *cert. denied*, 116 S.Ct. 1571, 134 LED. 2d 670 (1996).  See A.2., *supra*.

(Tab #R-61, p. 36).

This issue was not raised on appeal from the denial of the Rule 32 petition and it is therefore procedurally barred from federal review.  This issue too is both unexhausted but also procedurally defaulted because no state remedy is now available.  *O'Sullivan v. Boerckel*, *supra*.  There has been no showing of cause for the failure to raise this claim on appeal from the denial of the Rule 32 petition or prejudice resulting therefrom.

Moreover, because of the procedural default, the court need not look back to the ruling on the Rule 32 petition to determine whether it was contrary to or involved an unreasonable application of federal law.  Because Parker presented no evidence on this issue at the Rule 32 hearing, the trial court's decision could not have been based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

Based on the foregoing, the court concludes that the petition for writ of habeas corpus is due to be DENIED.

A separate Final Judgment consistent with this Memorandum of Opinion will be entered simultaneously herewith.

As to the foregoing it is so **ORDERED** this the 30th day of September, 2005.

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE